## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

RECEIVED

2006 NOV 29  P 2: 50

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| CITY OF BRUNDIDGE, ALABAMA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRUNDIDGE LANDFILL, LLC, )<br>ALLIED WASTE INDUSTRIES, INC., )<br>ALLIED WASTE NORTH AMERICA, )<br>INC., )<br>)<br>Defendants. | CIVIL ACTION NO.<br>2:06CV1066 - MEF<br>[Case No. CV-06-0275-JWK in<br>the Circuit Court of Pike County,<br>Alabama] |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1446, Defendants Brundidge Landfill, LLC; Allied

Waste Industries, Inc.; and Allied Waste North America, Inc. (collectively

"Defendants") file this Notice of Removal to remove this civil action from the

Circuit Court of Pike County, Alabama, wherein it was filed as CV-06-0275-JWK,

to the United States District Court for the Middle District of Alabama, Northern

Division, and show unto this Honorable Court as follows:

### I.    RELEVANT PROCEDURAL FACTS.

1.    The Plaintiff, the City of Brundidge,  instituted this action in the

Circuit Court of Pike County, Alabama, on or about October 26, 2006, against the

named defendants. Said case number being CV-06-0275-JWK. *See* Plaintiff's Complaint with attachments as filed, attached as Exhibit A.

2.    Based on the case action summary sheet of the Circuit Court of Pike County, Alabama, for this case, CV-06-0275-JWK, Defendants Brundidge Landfill, LLC and Allied Waste North America, Inc. were served by certified mail on October 30, 2006. *See* Alacourt's Case Action Summary Sheet, attached as Exhibit B. Defendant Allied Waste Industries, Inc. was served by certified mail on October 31, 2006. *Id.*

3.    The Plaintiff in the Complaint has alleged that the Plaintiff is a political subdivision of the State of Alabama and a body corporate under Alabama Code Section 11-1-2. *See* Complaint, Exhibit A.

4.    Defendant Brundidge, LLC, is a Delaware corporation with its principal place of business in Phoenix, Arizona.

5.    Defendant Allied Waste Industries, Inc. is Delaware corporation with its principal place of business in Phoenix, Arizona.

6.    Defendant Allied Waste North America, Inc. is a Delaware corporation with its principal place of business in Phoenix, Arizona.

7.    This action could have been filed in this Court, pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between Plaintiff and

Defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## II.    DIVERSITY OF CITIZENSHIP.

8.    Based upon the Plaintiff's Complaint, the Plaintiff is a political subdivision of the State of Alabama and a body corporate under Alabama Code Section 11-1-2.

9.    Defendant Allied Waste Industries, Inc. is Delaware corporation with its principal place of business in Phoenix, Arizona.  Pursuant to 28 U.S.C. §1332(c)(1), Allied Waste Industries, Inc. is a citizen of the State of Arizona.  As a result, Allied Waste Industries, Inc. is not now, and was not at the time of the filing of the Complaint, a resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of cases.

10.    Defendant Allied Waste North America, Inc. is a Delaware corporation with its principal place of business in Phoenix, Arizona.  Pursuant to 28 U.S.C. §1332(c)(1), Allied Waste North America, Inc. is a citizen of the State of Arizona.  As a result, Allied Waste North America, Inc. is not now, and was not at the time of the filing of the Complaint, a resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of cases.

3

11.    Defendant Brundidge Landfill, LLC is a limited liability company. *See* Affidavit of Jo Lynn White, attached as Exhibit C.  In *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020 (11th Cir. 2004), the Eleventh Circuit held that, for purposes of diversity jurisdiction, "a limited liability company is a citizen of any state of which a member of the company is a citizen." *Rolling Greens*, 374 F.3d at 1022.

12.    The sole member of Brundidge Landfill, LLC is Defendant Allied Waste North America, Inc.  *See* Brundidge Landfill, LLC Operating Agreement, attached as Exhibit 1 to Exhibit C.  Defendant Allied Waste North America, Inc. is a Delaware corporation with its principal place of business in Phoenix, Arizona. As a result, Brundidge Landfill, LLC is not now, and was not at the time of the filing of the Complaint, a resident of the State of Alabama within the meaning of current federal precedent relating to the removal of cases.

13.    Based on the foregoing, this action could have been filed in this Court pursuant to 28 U.S.C. §1332 in that there is a complete diversity of citizenship between the Plaintiff and the Defendants.

### III.    AMOUNT IN CONTROVERSY.

14.    At a minimum, the amount in controversy exceeds $100,000.  This dispute centers around a contract to provide garbage disposal services.  Plaintiff

4

alleges that the contract was worth, *at a minimum*, $143, 100.00 to date if performed under the terms to which Plaintiff asserts Defendants are bound.

15.    Specifically, on May 1, 2002, Plaintiff entered into an agreement with Brundidge Landfill, LLC for the development, operation and management of a landfill within the City of Brundidge (hereinafter "the Landfill"). *See* May 1, 2002 Agreement between the City and Brundidge, LLC (the "Agreement"), attached as Exhibit D.

16.    Plaintiff's Complaint alleges a variety of claims and seeks both compensatory and punitive damages. Specifically, Plaintiff brings suit against all Defendants for fraud and deceit, breach of contract, promissory estoppel and seeks a declaratory judgment that the Agreement is terminated and null and void.

17.    The crux of Plaintiff's Complaint alleges that Defendants breached a contract which Plaintiffs say required Defendants to direct a minimum of 1200 tons per day on a monthly average of waste to the landfill. *See* Complaint, Exhibit A, ¶9. As Plaintiff acknowledges in its Complaint, "the City's revenues are derived from fees assessed on each ton entering the City's Landfill." *Id.* ¶ 12. Under the undisputed terms of the contract, this monthly administrative fee is calculated based on a graded pay scale for certain amounts of tonnage delivered to the City per day. *See* Agreement, Exhibit D, ¶ 14. Plaintiff alleges that the Defendants have "never directed more than 570 tons per day on a monthly average

5

to the Landfill." *See* Complaint, Exhibit A, ¶ 11. In other words, Plaintiff alleges

that, on any given month, 570 tons per day is the maximum amount used to

calculate the administrative fee to the City.

18.    Applying the contractual pay scale to the numbers Plaintiff pleads in

its Complaint, at 570 tons per day, Plaintiff is alleging that Defendants never made

monthly payments in an amount more than $655.50 from the date of execution of

the contract on May 1, 2002. If Defendant had delivered this amount every month

since the contract's execution, Plaintiff could have received no more than

$34,731.50 in administrative fees. Applying the Agreement's pay scale to the

1200 tons per day to which the Plaintiff claims entitlement, Plaintiff is alleging that

Defendants should have paid a minimum of $2700.00 every month since May 1,

2002. In other words, Plaintiff alleges it should have received *at a minimum*

$143,100.00. Simple math yields a differential between these amounts of over

$100,000.00, well over the prerequisite jurisdictional threshold.

19.    In other words, using the pay scale in the contract, Plaintiff alleges

that Defendants never paid it more than $655.50 a month. Plaintiff alleges that

Defendant *should* have paid it at least $2,700 a month. The discrepancy between

those two numbers, multiplied over the life of the contract to date, is $108,368.00 –

which clearly exceeds the jurisdictional minimum.

20.    Using the numbers Plaintiff itself states in its Complaint, the

calculation is as follows:

| Minimum Value of Agreement, as Asserted by Plaintiff | 1200 tons p/day x 53 months x $2.25 p/ton<br><br>= $143,100.00 |
|---|---|
| Maximum Value of Monies Received, as Asserted by Plaintiff | 570 tons p/day x 53 months x $1.15 p/ton<br><br>= $34,731.50 |
| <u>Minimum</u> Amount in Controversy | $143,100.00 - $34,731.50<br><br>= <u>$108, 368.50</u> |

21.    Of course, in its Complaint, Plaintiff further alleges that "[p]resently,

Defendant directs less than ninety-six (96) tons per day on a monthly average to

the Landfill." *See* Complaint, Exhibit A, ¶ 11. This means that the actual dollar

amount allegedly received in administrative fees by Plaintiff will be less than if

Defendants had delivered 570 tons per day and, thus, the amount in controversy

would be even greater.

22.    In order to meet the $75,000.00 jurisdictional threshold, even in a case

with an unspecified claim for damages, if "the amount in controversy more likely

than not exceeds the [now $75,000] jurisdictional requirement" the threshold will

be met. *Tapscott*, 77 F.3d at 1357; *Kilpatrick v. Martin K. Eby Construction Co.,*

*Inc.*, 708 F. Supp. 1241, 1242-43 (N.D. Ala. 1989) (holding that the "amount in

controversy requirement has been met" even though "the State Court complaint does not demand judgment of a specified dollar amount"). In this case, Defendant can remove to federal court if it can show, by a preponderance of the evidence, facts supporting jurisdiction. *Tapscott*, 77 F.3d at 1356-57. A lower burden of proof is warranted where damages are unspecified because there is simply no estimate of damages to which a court may defer. *Id.*

23.    Prospective punitive damages must also be considered in any calculation of the amount in controversy. *See Holley Equipment Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987) ("When determining the jurisdictional amount in diversity cases, punitive damages must be considered, unless it is apparent to a legal certainty that such cannot be recovered.") (citations omitted); *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943) (claims for compensatory and punitive damages should be aggregated to determine jurisdictional amount in controversy); *Wakeland v. Brown & Williamson Tobacco Corp.*, 996 F. Supp. 1213, 1222 (S.D. Ala. 1998) (applying "preponderance of the evidence standard" and finding that amount in controversy requirement was satisfied even though complaint did not specify amount of damages).

24.    In the instant case, using nothing more than the basic calculations provided in the Plaintiff's own Complaint for the disputed monthly payments will easily exceed this Court's jurisdictional threshold. Plaintiff's Complaint

8

demonstrates that the amount of monthly payments allegedly due and owing, which are the basis for the claim against Defendants in this case, are in excess of $100,000.00.

25.    For the foregoing reasons, it is more likely than not that the jurisdictional amount for diversity jurisdiction is met in this case.[1]

## IV.    THE OTHER REMOVAL PREREQUISITES HAVE BEEN SATISFIED.

26.    This Notice of Removal is filed within thirty days of service of the Complaint upon the first served Defendant, and is timely under 28 U.S.C. § 1446(b).

27.    The Defendants have sought no similar relief with respect to this matter and all Defendants consent to the removal of this action.  *See* Defendants' Consent to Removal, attached as Exhibits E through G.

28.    The prerequisites for removal under 28 U.S.C. § 1441 have been met.

---

[1] If any question arises as to the existence of the requisite amount in controversy, then Defendants request the opportunity to submit post-removal evidence in accordance with the procedure adopted by the Eleventh Circuit in *Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 949 (11th Cir. June 26, 2000).  In affirming the denial of plaintiff's motion to remand, the Eleventh Circuit held that the district court properly considered defendant's post-removal evidence including defendant's requests for admission directed to the amount in controversy. The Eleventh Circuit explained that, "[w]e align ourselves with our sister circuits in adopting a more flexible approach, allowing the district court when necessary to consider post-removal evidence in assessing removal jurisdiction." *Id.*

29.    Written notice of the filing of this Notice of Removal will be given to the adverse party as required by law.

30.    A Notice of Filing Notice of Removal, with a copy of this Notice of Removal attached, shall be promptly filed with the Circuit Court Clerk for the Circuit Court of Pike County, Alabama.

31.    The allegations of this notice are true and correct, this cause is within the jurisdiction of the United States District Court for the Middle District of Alabama, Northern Division, and this cause is removable to the United States District Court for the Middle District of Alabama, Northern Division.

32.    If any question arises as to the propriety of the removal of this action, Defendants, request the opportunity to present a brief and oral argument in support of its position that this case is removable.


WHEREFORE, Defendants, desiring to remove this case to the United States District Court for the Middle District of Alabama, Northern Division, being the district and division of said Court for the County in which said action is currently pending, prays that the filing of this Notice of Removal shall effect the removal of said suit to this Court.

*C. Meade Hartfield*

One of the Attorneys for Defendants
Brundidge Landfill, LLC
Allied Waste Industries, Inc.
Allied Waste North America, Inc.

OF COUNSEL:
J. Banks Sewell, III (SEW003)
J. Chandler Bailey (BAI043)
C. Meade Hartfield (HAR281)
LIGHTFOOT, FRANKLIN & WHITE,
L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of November, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

[Insert Name/Address]

And I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants (if applicable):

> Andrew P. Campbell
> Caroline Smith Gidiere
> CAMPBELL, WALLER & POER, LLC
> 2100-A SouthBridge Parkway, Suite 450
> Birmingham, LA 35209
> 205.803.0051
> Fax: 205.803.0053
>
> Richard F. Calhoun
> CALHOUN, FAULK, CURTIS & FAIRCLOTH, LLC
> 78 S. Court Square
> P.O. Box 489
> Troy, AL 36081
> 334.566.7200

Respectfully submitted,

_C. Meade Hartfield_
Of Counsel

12

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
10/30/2006
Log Number 511604310

**TO:**  Gunhild Humphrey, Paralegal
Allied Waste Industries, Inc.
15880 North Greenway-Hayden Loop, Suite 100
Scottsdale, AZ, 85260

**RECEIVED**

**NOV 0 1 2006**

**RE:**  **Process Served in Alabama**

**FOR:**  Allied Waste North America, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | City of Brundidge, Pltf. vs. Brundidge Landfill, LLC, et al., including Allied Waste North America, Inc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Pike County Circuit Court, AL<br>Case # CV 2006 000275 |
| **NATURE OF ACTION:** | failure to comply with terms of agreement. |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 10/30/2006 postmarked on 10/26/2006 |
| **APPEARANCE OR ANSWER DUE:** | 30 days |
| **ATTORNEY(S) / SENDER(S):** | Richard F. Calhoun<br>Calhoun, Faulk, Curtis & Faircloth, LLC<br>78 S. Court Square<br>PO Box 489<br>Troy, AL, 36081<br>334-566-7200 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day, 798031668949<br>Email Notification, Gunhild Humphrey gunhild.humphrey@awin.com |
| **SIGNED:**<br>**ADDRESS:** | The Corporation Company<br>2000 Interstate Park Drive<br>Suite 204<br>Montgomery, AL, 36109 |
| **TELEPHONE:** | 334-387-7680 |

Page 1 of  1 / SR

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of the package only, not of its contents.

**EXHIBIT**

tabbies

_A_

```
AVSO300                   ALABAMA JUDICIAL DATA CENTER
                              PIKE        COUNTY

                                  SUMMONS
                                                     CV 2006 000275.00
                                                     JEFFERY W KELLEY
|-------------------------------------------------------------------------|
|                 IN THE CIRCUIT  COURT OF     PIKE        COUNTY          |
|                                                                         |
| CITY OF BRUNDIDGE, ALABAMA  VS  BRUNDIDGE LANDFILL, LLC, ETALS           |
|                                                                         |
|        SERVE ON: (D003)                                                 |
|                                                                         |
|                                       PLAINTIFF`S ATTORNEY              |
|                                                                         |
|        ALLIED WASTE NORTH AMERICA, IN    CALHOUN RICHARD F              |
|        %CORPORATION CO/STE.204           P O BOX 489                    |
|        2000 INTERSTATE PARK DR                                          |
|        MONTGOMERY      ,AL  36109-0000   TROY           ,AL  36081-0000 |
|-------------------------------------------------------------------------|
| TO THE ABOVE NAMED DEFENDANT:                                           |
|                                                                         |
|   THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST |
| TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS, YOU OR YOUR ATTORNEY ARE  |
| REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER     |
| ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS |
| ATTORNEY(S) SHOWN ABOVE OR ATTACHED:                                    |
|                                                                         |
|   THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS |
| AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE    |
| ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. |
| YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE COURT BELOW.    |
|                                                                         |
|-------------------------------------------------------------------------|
| ( )   TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR |
|       4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:   |
|       YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE  |
|       COMPLAINT IN THIS ACTION UPON DEFENDANT.                          |
|                                                                         |
| (√)   THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE |
|       WRITTEN REQUEST OF _____ PURSUANT TO RULE 4.1(C)       |
|       OF THE ALABAMA RULES OF CIVIL PROCEDURE.                          |
|                                                                         |
| DATE: 10/27/2006                  CLERK:BRENDA M. PEACOCK      BY:      |
|                                        120 W CHURCH STREET              |
|                                        TROY  AL   36081                 |
|                                        (334)566-5113                    |
|                                                                         |
|-------------------------------------------------------------------------|
|     RETURN ON SERVICE:                                                  |
| ( )   CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____  |
|       (RETURN RECEIPT HERETO ATTACHED)                                  |
|                                                                         |
| ( )   I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND   |
|                                                                         |
|       COMPLAINT TO _____ |
|                                                                         |
|       IN _____ COUNTY, ALABAMA ON (DATE) _____ |
|                                                                         |
| _____    _____ |
| DATE                                     SERVER SIGNATURE               |
|                                                                         |
| _____    _____ |
| SERVER ADDRESS                           TYPE OF PROCESS SERVER         |
|                                                                         |
|-------------------------------------------------------------------------|
OPERATOR: JAS
PREPARED: 10/27/2006
```

IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

CITY OF BRUNDIDGE, ALABAMA,

     **Plaintiff,**

v.

**BRUNDIDGE LANDFILL, LLC, ALLIED
WASTE INDUSTRIES, INC., ALLIED
WASTE NORTH AMERICA, INC.,**

     **Defendants.**

## COMPLAINT

COMES NOW, Plaintiff, City of Brundidge, Alabama, and pursuant to *Alabama Rule of Civil Procedure* 7, files the following complaint against Brundidge Landfill, LLC, Allied Waste Industries, Inc., Allied Waste North America, Inc., for fraud and deceit, breach of contract, promissory estoppel and seeks a declaratory judgment that the May 1, 2002 Agreement between Brundidge Landfill, LLC and the City of Brundidge, Alabama is terminated, and is null and void.

## PARTIES

1.    The City of Brundidge, Alabama (the "City"), a political subdivision of the State of Alabama and a body corporate, *see* Alabama Code § 11-1-2.

2.    Brundidge Landfill, LLC, is a Delaware limited liability company with its principal place of business within the city limits of the Brundidge, Alabama, in this judicial circuit.

3.    Allied Waste Industries, Inc., is a publicly traded Delaware corporation doing business by agent in Alabama and in this judicial circuit. Brundidge Landfill, LLC is a wholly owned subsidiary of Allied Waste and an alter ego of the same.

4.    Allied Waste North America, Inc., is an Arizona corporation and a wholly owned subsidiary of Allied Waste Industries, Inc., doing business by agent in Alabama and in this judicial circuit. Allied Waste North America, Inc., manages Brundidge Landfill upon behalf of Allied Waste Industries, Inc. Brundidge Landfill is an alter ego of Allied Waste North American, Inc.

## ALLEGATIONS

5.    All acts and events giving rise to this complaint took place in this judicial circuit.

6.·    On or about May 1, 2002, the City and Brundidge Landfill entered into an agreement for the development, operation and management of a landfill within the City (hereinafter referred to as the "the Landfill."). *See* May 1, 2002 Agreement between the City and Brundidge Landfill, LLC (the "Agreement"), attached as Exhibit A.

7.    The Agreement was for a stated term of three (3) years, renewable at the option of the City for successive additional terms of three years, without limitation. *See* Agreement at para. 1. The Agreement renewed automatically on May 1, 2005.

8.    In the preamble to the Agreement, the parties identified a number of premises providing consideration for the Agreement, including, but not limited to:

> WHEREAS, [Brundidge Landfill] and the City anticipate that the sanitary landfill will receive at least a monthly average of 1,200 tons per day of non-hazardous and non-infectious solid waste[.]

*See* Agreement at p. 2.

9.    In negotiations relating to the Agreement, Defendants made representations and promises to Plaintiff without any present intention of performing them. Specifically, representatives of Brundidge Landfill, represented to the City they intended to direct *a minimum* of 1200 tons per day on a monthly average of waste to the Landfill. Defendant requested the service area provided in the Agreement be expanded from that contained in prior contracts, as well as the accompanying host governmental approval, to encompass all states east of the Mississippi River, in addition to the state of Louisiana, in order to facilitate

Defendant's intention of directing a minimum of 1200 tons per day on a monthly average with a maximum of 7500 tons per day on a monthly average.

10.    Defendant's promises relating to average daily tonnage were material to the City's determination to enter into the Agreement with Brundidge Landfill as well as the decision to provide expanded host governmental approval for the Landfill.  Indeed, Defendant's representations are set forth in the preamble to the Agreement as consideration for the same.

11.    At the time of making the representations, Defendant had no intention of fulfilling its stated intention of directing a minimum of 1200 tons per day on a monthly average to the Landfill.  These representations were intentionally made for the purpose of deceiving and misleading Plaintiff.  Defendant has never directed more than 570 tons per day on a monthly average to the Landfill. Presently, Defendant directs less than ninety-six (96) tons per day on a monthly average to the Landfill.

12.    Plaintiff relied upon Defendants misrepresentations of material fact and promises and, as a result, has been damaged.  The City's revenues are derived from fees assessed on each ton entering the City's Landfill.

13.    The Agreement provides that Defendant "shall have the landfill open to the City between the hours of 4:00 a.m. and 5:00 p.m., local time, Monday through Friday, and 4:00 a.m. to 12:00 p.m. Sunday." *See* Agreement at para. 4.

14.   Defendant has failed and continues to fail to comply with the terms of the Agreement by having the Landfill open during the specified hours.

15.   On September 12, 2006, and pursuant to the terms of the Agreement, the City provided written notice to Defendant of breach of the Agreement and gave Defendant thirty (30) days to come within compliance.  As of the time of filing of this lawsuit, Defendant has failed to comply with the terms of the Agreement.

16.   As a result of Defendant's breach, the City has been damaged.

## CLAIMS

## COUNT I - FRAUD AND DECEIT

17.   Plaintiff incorporates by reference all prior paragraphs.

18.   Defendant is liable to Plaintiff for willful misrepresentation of a material fact made to induce Plaintiff to act, and upon which Plaintiff did. Defendant is liable for making a promise to Plaintiff without any intention of performing the promise.

19.   Plaintiff relied upon Defendant's willful misrepresentations and promises to its detriment.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory and punitive damages, attorney fees, and costs, and any and all other further relief that may be granted.

## COUNT II – BREACH OF CONTRACT

20.    Plaintiff incorporates by reference all prior paragraphs.

21.    Defendant is liable to Plaintiff for breach of the Agreement.

22.    As a result of Defendant's breach, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, attorney fees, and costs, and any and all other further relief that may be granted.

## COUNT III - DECLARATORY JUDGMENT

23.    Plaintiff incorporates by reference all prior paragraphs.

24.    Pursuant to the terms of the Agreement, an injured party is entitled to terminate the Agreement if the breaching party fails to cure within thirty days of receipt of notice of deficiency.  *See* Agreement at para. 38 ("In the event no correction is made within said thirty (30) day period, . . . , then the injured party, at its sole option, may terminate this Agreement because of the breaching party's breach thereof and said injured parties shall have all remedies enumerated herein and available under the laws of the State of Alabama.").

25.    On September 12, 2006, Plaintiff provided notice of deficiency to Brundidge Landfill regarding failure to comply with the terms of the Agreement relating to hours of operation.

26.    As of the filing of this complaint, on or about October 24, 2006, Brundidge Landfill has failed to comply with the terms of the Agreement.

WHEREFORE, premises considered, Plaintiff demands a declaratory judgment that the Agreement is terminated and is null and void due to Brundidge Landfill's breach of the Agreement.

## COUNT IV - PROMISSORY ESTOPPEL

27.    Plaintiff incorporates by reference all prior paragraphs.

28.    Defendants made a promise to Plaintiff regarding minimum average daily tonnage which Defendants reasonably should have expected would induce Plaintiff to enter into the Agreement and to provide Defendants with host governmental approval.

29.    Plaintiffs acted to execute the Agreement and grant of expanded host governmental approval in reliance upon Defendants' promise relating to minium average daily tonnage.

30.    Injustice can only be avoided by enforcement of Defendants' promise.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, attorney fees, and costs, and any other, further relief to which it may be entitled.

## <u>COUNT VII - ALTER EGO</u>

31.    Plaintiff incorporates by reference all prior paragraphs.

32.    Because Brundidge Landfill is an alter ego of Allied Waste

Industries, Inc., and Allied Waste North America, Inc., Plaintiff is entitled to

judgment against Defendants jointly and severally as if they are one company.

WHEREFORE, premises considered, Plaintiffs demand judgment against

Allied Waste Industries, Inc., and Allied Waste North America, Inc., jointly and

severally for compensatory and punitive damages, interest, attorney's fees, and

costs of court.

Respectfully submitted,

Richard F. Calhoun (CAL014)
One of the Attorneys for Plaintiff

OF COUNSEL:
Andrew P. Campbell
Caroline Smith Gidiere
CAMPBELL, WALLER & POER, LLC
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
205.803.0051
Fax: 205.803.0053

Richard F. Calhoun
Calhoun, Faulk, Curtis & Faircloth, LLC
78 S. Court Square
P. O. Box 489
Troy, AL 36081
334.566.7200



**JURY DEMAND**

Plaintiff hereby requests trial by struck jury in this cause of action.

_____

Of Counsel

EXHIBIT A

51

## Appendix J - Copy of Agreement

*CITY*
*ORIGINAL*

STATE OF ALABAMA    )
                        )
PIKE COUNTY         )

### AGREEMENT

THIS AGREEMENT, made and entered into this 1st day of May 2002 (the "Effective Date"), by and between the City of Brundidge, Alabama, a political subdivision of the State of Alabama, acting by and through its governing body, the City Council of the City of Brundidge, hereinafter referred to as the "City", and Brundidge Landfill, LLC, a Delaware limited liability company, hereinafter referred to as the "Contractor."

### WITNESSETH:

WHEREAS, Contractor and the City desire that Contractor modify existing Alabama Department of Environmental Management solid waste management permit No. 55-07 to operate a landfill within the City which would guarantee the disposal of the City of Brundidge's non-hazardous solid waste in the City of Brundidge at a Subtitle D Landfill Facility; and,

WHEREAS, the proposed permit modification will increase both said landfill's service area to encompass certain out-of-state areas and the daily maximum volume of waste permitted to be disposed in the landfill; and,

WHEREAS, such permit modification can only take place following the City's local approval considered and bestowed pursuant to Ala. Code 22-27-48(a); and,

WHEREAS, the City Council is ultimately responsible for providing for the disposal of non-hazardous solid waste generated within its jurisdiction; and,

WHEREAS, the Contractor desires to assist the City in solving the problems associated with non-hazardous solid waste disposal; and,

WHEREAS, the City has chosen under state law, Ala. Code §22-27-47(a), to develop and to submit its own solid waste management plan for implementation within its city limits, and this Agreement is an integral part of the development and submission of the City's solid waste management plan; and,

WHEREAS, the Contractor desires to develop and operate a sanitary landfill which has state of the art environmental safeguards, which include a leachate collection system, a composite liner system, storm water control and filtration system, perimeter gas monitoring probes, groundwater-monitoring wells and waste stream monitoring that will meet or exceed all current and future applicable state and federal rules and regulations for the operation of a sanitary landfill; and,

#570434(Word)

### Polyengineering, Inc.

52

WHEREAS, the City has determined that the Contractor's proposed landfill shall provide the City with an environmentally secure location to dispose of non-hazardous and non-infectious solid waste which will promote economic growth and is a logical alternative to the City's disposal practice; and,

WHEREAS, the Contractor and the City anticipate that the sanitary landfill will receive at least a monthly average of 1,200 tons per day of non-hazardous and non-infectious solid waste; and,

WHEREAS, the City desires that the Contractor's proposed increased operations at the sanitary landfill will commence as soon as possible; and,

WHEREAS, the City desires that the road segment between U.S. Highway 231 and the landfill's entrance (Clean Water Drive, hereinafter referred to as "the entrance road") be maintained and kept as litter-free as reasonably possible given the City's desire to attract new business to adjacent property; and,

WHEREAS, the City has determined that entering into this agreement is in the best interest of its citizens.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein, and for other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged by each party hereto, the City Council of the City of Brundidge and Contractor do hereby agree as follows:

1.     Definitions - All words, terms, phrases, etc., used in this Agreement that relate to solid waste management and/or sanitary landfill design, permitting, construction, operation and management shall be the same words, terms, phrases, etc., as used and defined in the Solid Wastes Disposal Act (Alabama Acts 1982, No. 82-612) codified at 22-27-1, et. seq., Code of Alabama (1975), as amended from time to time and the regulations promulgated thereunder.

2.     Scope of Work - Contractor agrees to furnish all labor, material, equipment and land for the disposal of non-hazardous and non-infectious solid waste in a landfill wholly or partially within the City of Brundidge and owned and operated by Contractor. All costs of the landfill operation will be borne by the Contractor.

3.     Term - This Agreement shall be for a term of three (3) years, commencing on the date of the execution of this Agreement. City shall have the right to renew this Agreement for successive additional terms of three (3) years, without limitation. Unless the City shall give written notice of its desire not to renew to the Contractor at least three (3) months prior to the expiration date of the term hereof or any renewal term, then this contract shall be automatically renewed for an additional term of three (3) years.

4.     Hours -- Contractor shall have the landfill open to the City between the hours of 4:00 a.m. and 5:00 p.m., local time, Monday through Friday, and 4:00 a.m. to

#570434(Word)                 2

**P**olyengineering, Inc.

53

12:00 p.m. Saturday. The Contractor and the City agree that the Contractor, at its discretion, may have the landfill open at other hours to facilitate disposal of non-hazardous and non-infectious solid waste.

5.    <u>Holidays</u> - Contractor may close the landfill on the following holidays: New Year's Day, Martin Luther King's Birthday, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. The holidays the landfill is open or closed will ultimately be determined at the discretion of the Contractor.

6.    <u>Life of the Landfill</u> - The City shall have disposal capacity privileges for waste generated by it and its citizens, residents, and inhabitants at the site of the landfill for the life of the Contractor's landfill, which shall be a minimum of twenty-five (25) years.

7.    <u>Laws, Rules and Regulations</u> - Contractor shall comply with all Federal, State and local laws, rules, regulations and permit conditions regulating solid waste transportation, management, storage and disposal.

8.    <u>Operational Standards</u> - To insure the environmental integrity of the sanitary landfill, the Contractor shall design, implement, or perform environmental safeguards at said landfill as follows:

8.1    Contractor shall apply at regular intervals daily, intermediate and final cover, or alternative cover permissible under applicable law, and shall keep the disposal area to the smallest practical size to reasonably control air quality, odors and eliminate rodents, insects and disease vectors.

8.2    Contractor shall install any and all composite liners, leachate collection systems, storm water control and filtration systems, ground water monitoring systems, landfill gas monitoring system and similar devices intended to prevent and/or monitor soil and groundwater contamination from the landfill as may be required by Subtitle D or other federal or state statutes and regulations, as amended.

8.3    Contractor shall take all reasonable steps to control litter. Steps shall include a requirement that all open bodied vehicles using the landfill be covered and shall include the daily pickup of all windblown litter.

8.4    Contractor shall implement an effective dust management and suppression program.

8.5    Contractor shall make reasonable efforts to minimize the amount of mud tracked onto the entrance road. Contractor shall be responsible for periodically cleaning entrance road of mud tracked from the Contractor's sanitary landfill. In the case the Contractor cannot prevent the tracking of mud, Contractor

**P**olyengineering, **I**nc.

54

shall install and operate a wheel wash unit or equivalent technology in order to prevent the tracking of mud from the landfill property.

8.6    Contractor agrees to adhere to the design, construction and operational plans for the landfill, as approved by the Alabama Department of Environmental Management ("ADEM"). Contractor also agrees to permit an independent third party, selected and hired by the City, to annually audit the landfill to assess both the landfill's waste disposal operations and compliance with both this agreement and with the relevant environmental laws and regulations. The cost of this audit shall be borne by the Contractor, and the auditor shall invoice Contractor directly for payment for its services. Copies of the audit shall be furnished to both City and Contractor.

8.7    Subject only to the limits of the performance bond required by Section 26, unless some greater obligation is imposed by law, Contractor agrees to remove, remedy or otherwise respond in a manner protective of public health and the environment, any contaminants or hazardous substances which are released into the environment due to the operation of the landfill.

8.8    Contractor agrees to establish a 100-foot vegetative buffer around the perimeter of the landfill to be utilized as visual screening to the site.

8.9    Contractor agrees to landscape the entrance area into landfill.

8.10    Contractor agrees to minimize the number of acres cleared at any one time. Contractor shall reseed all cleared land immediately after use of said land for waste disposal is complete. Contractor will reforest all cleared land not used for waste disposal after its use is complete.

8.11    Contractor agrees to reasonably maintain all-weather interior roads to allow vehicle movement during inclement weather. The cost of such improvements shall be at the sole expense of the Contractor.

8.12    Contractor shall install an active methane gas extraction and collection system at the landfill site as required by regulations. Should odors from the landfill be discernable beyond the perimeter of the landfill, Contractor shall install a methane gas extraction and collection system capable of eliminating said odors. Once landfill gas volumes are sufficient to economically sustain a generating plant, and should one be developed, Contractor will offer to City the advantage of utilizing such power at a rate to be determined.

8.13    Contractor agrees to properly staff and train all landfill personnel in a manner consistent with the safe and secure operation of a solid waste landfill.

8.14    Contractor agrees to construct the landfill to have a sufficient designed capacity and to have sufficient equipment and personnel to comply with

#570434(Word)                                    4

**P**olyengineering, Inc.

55

Federal, State and local laws, rules, regulations, permit conditions, etc., regarding solid waste disposal.

8.15   Contractor agrees to provide the City with disposal capacity assurances for the life of the landfill, which shall be a minimum of twenty-five (25) years.   At periodic intervals not to exceed twelve months, the Contractor agrees to notify the City of annual compaction test results and advise the City of forecasted remaining landfill capacity and remaining landfill life (in years) for the landfill.

8.16   Contractor agrees to exercise reasonable efforts, to include regularly scheduled clean-up activities, to keep the entrance road as litter-free as reasonably possible.

8.17   In order to assure adequate post-closure care and monitoring of the landfill, Contractor agrees to fully comply with the requirements of 40 C.F.R. §§ 258.60 through 258.73 inclusive.   Within ninety days of the execution of this Agreement, Contractor shall provide the City with evidence, in the form of a letter from ADEM, stating that the Contractor possesses adequate financial assurance posted with the state to operate a landfill of the size and operation contemplated by this Agreement.   Contractor will also advise the City when closure plans are being prepared and will allow the City a timely opportunity to comment on those plans.

9.   Insurance - The Contractor shall carry the following types of insurance naming the City as an additional insured, in at least the limits specified below:

| | | |
|---|---|---|
| General Liability | - | $1,000,000 per each occurrence |
| Automotive Liability | - | $1,000,000 bodily injury and property damage, |
| | | combined single limit per each occurrence |
| Property Damage | - | $1,000,000 per each occurrence |
| Umbrella Liability | - | $5,000,000 per occurrence |

9.1   All policies evidencing the insurance required by the terms of the preceding paragraph shall be taken out and maintained in generally recognized responsible insurance companies, qualified under the laws of the State of Alabama and may be written with co-insurance provisions and deductible amounts comparable to those applicable to similar policies carried by persons engaged in businesses of like size and type as the Contractor with respect to properties similar to the landfill.   The Contractor may self-insure for all or any part of the above coverage's with the prior written consent of the City, which consent shall not be unreasonably withheld, provided satisfactory evidence of the capacity to self-insure is provided to the City.   Any policies required by Section 9 of this agreement may be contained in blanket policies.

**P**olyengineering, Inc.

56

9.2    Provided, however, that in the event Contractor is unable to obtain insurance in the above stated limits at reasonable rates, and Contractor provides City with satisfactory evidence of Contractor's inability to acquire said insurance at reasonable rates, both parties agree to execute an amendment to this Agreement reflecting new limits for the above stated insurance. In such case the failure of Contractor to maintain insurance pursuant to Section 9 shall not constitute a default or breach under this Agreement.

9.3    Prior to the commencement date, the Contractor shall furnish to the City appropriate certificates of insurance certifying coverage's under each of the categories set forth in Section 9 above. Each certificate so furnished shall provide that the policy may not be canceled or materially changed without ten (10) days written notice to the City.

9.4    The Contractor will comply with the provisions of all applicable Workmen's Compensation laws. Contractor shall supply to City, upon request, certificates of insurance evidencing such coverage as described herein.

10.    Wasteshed, Volume Capacity and Usage - The Contractor is authorized to accept non-hazardous and non-infectious solid waste generated in a service area encompassing all states east of the Mississippi River, in addition to the entire state of Louisiana.- The City and the Contractor agree that Contractor's landfill shall have a permitted volume capacity not to exceed 7500 tons per day, monthly average, pursuant to ADEM regulations. Contractor further agrees that no change, variance, waiver or modification to or from any provision of any permit issued by ADEM to Contractor regarding the operation of the landfill will be requested from ADEM without prior approval by the City.

11.    Sole Deposit Point - City agrees to the extent legally permissible during the term of this Agreement, or any extension thereof, to direct the disposal of all non-hazardous and non-infectious solid waste collected within the City by City's franchise haulers or by City in City-owned vehicles to Contractor's sanitary landfill.

12.    Landfill Rules and Regulations - The Contractor shall have the right to establish and, from time to time, modify, alter or rescind, reasonable standards and policies necessary, appropriate or desirable for the operation of the landfill, including standards concerning access, safety, operation and types of substances to be deposited in the landfill.

12.1    All standards and policies established by the Contractor shall be posted at the landfill and a copy thereof shall be sent by registered mail, return receipt requested to the City; provided, however, that non-receipt by the City of such shall not affect the validity or effectiveness of the same.

12.2    When entering the site or delivering solid waste to the landfill, the City and its officials, agents and employees will comply with all reasonable

**P**olyengineering, Inc.

57

standards and policies established by the Contractor or otherwise applicable to the landfill to the extent that such standards and policies do not interfere with the City's governmental responsibilities, including by way of example its police powers and public health responsibilities. Nothing in this Agreement shall be deemed to supply standards and policies adopted by the Contractor with the force of law or subject such standards to enforcement by the City.

13.     Compensation and Billing - The Contractor shall charge a base charge (the "Gate Fee") for disposal of typical household, commercial and industrial solid waste in the landfill. Except for (i) the Gate Fee charge exemptions afforded to the residences located within the corporate limits of Brundidge, as identified in Sections 13.1 and 13.4; (ii) the disposal opportunities provided to the residents of Pike County, as identified below in Section 13.2 and 13.4 and (iii) the Gate Fee for the residential disposal for the governmental entities (or their contract collectors), as identified in Section 13.3, the Gate Fee shall be set at prevailing commercial rates. The Contractor may charge an additional reasonable fee or charge (a "Surcharge") for additional recovery, treatment, handling, storage or disposal of Special Wastes. All Gate Fees represented in this Section shall include any administrative fees and compensation as specified in Sections 14, 15, 16 and 17.

13.1     The Gate Fee assessed for the disposal of any residential waste generated or collected in Pike County, outside the corporate municipal limits of Brundidge, will be no more than $20.00 per ton, inclusive of all administrative fees, for the life of the landfill. However, once a twelve-month period passes during which the landfill achieves an average disposal rate of 1500 tons per day (as based on the relevant reporting to ADEM) throughout the course of that twelve-month period, the Contractor shall commence to provide free collection and disposal to the residents of Brundidge. The number of residents of Brundidge benefiting from such free collection and disposal shall not exceed 2,000 during the twelve-month period the City qualifies for this benefit and shall in no case ever exceed 3,000 residents thereafter. Once free collection and disposal privileges commence, they may not be revoked, even if disposal rates fall back below the aforementioned 1500 ton-per-day threshold.

13.2     The Gate Fee for the governmental entities or their contract providers for the counties of Autauga, Barbour, Bullock, Butler, Coffee, Conecuh, Covington, Crenshaw, Dale, Dallas, Elmore, Escambia, Geneva, Henry, Houston, Lowndes, and Montgomery shall be no more than $22.00 per ton, inclusive of all administrative fees. This rate will be subject to the CPI increases as specified in Section 13.6. This rate will also be subject to any increase in cost to cover expenses associated with complying with any new or modified ADEM or Federal regulations.

13.3     Any individual who is a resident of Pike County shall be entitled to use Contractor's landfill a maximum two (2) times per year at no charge provided that:

**P**olyengineering, Inc.

58

13.3.1. Said individual provides Contractor with proof of residence in Pike County, and provides proof of participation in a legitimate solid waste collection program.

13.3.2. The waste to be disposed of is generated at the customer's residence.

13.3.3. The total volume to be disposed of per load is less than 3 cubic yards or 1,000 pounds.

13.3.4. All waste to be disposed of under this section shall be pursuant to Section 31 of this Agreement.

13.4    The Contractor shall provide, maintain and operate suitable truck scales at the site and shall establish a reasonable system for ascertaining the quantity of solid waste measured by weight.  For each load of solid waste delivered to the landfill, the Contractor shall determine the weight and shall compute the applicable Gate Fee and surcharge, if applicable, and shall give a copy of the receipt to the driver or other person delivering such load and shall maintain a copy of such receipt.

13.5    Changes in the Gate Fee shall be calculated based on changes in the CPI.  The Contractor may increase the Gate Fee annually on each October 1, beginning with October 1, 2002.  The percentage of increase shall be based on, and shall be the same as the CPI.  Regardless of the CPI, however, any such increases shall not exceed 4% annually.  The base CPI shall be the CPI published for month of June 2001.  On July 1 of the first year in which the landfill is operational and every twelve (12) month period thereafter, Contractor shall, notwithstanding the annual 4% cap, compute the percentage of increase in the Gate Fee for the upcoming year based solely on the CPI.  Notices of increases must be submitted to applicable entities thirty days before the increase is effective.  The CPI increases do not apply to the Gate Fee rates for City of Brundidge or Pike County as specified in Section 13.1, 13.2 and 13.4.

14.    Administrative Fee - Contractor agrees to collect and forward to the City a host administrative fee to compensate the City for expenses (including equitable expenses) associated with the presence of a sanitary landfill within the jurisdiction of the City.  Contractor agrees to deliver to the City a fee on all solid waste that Contractor accepts for disposal at the Contractor's landfill, during the term of this Agreement.  The fee shall be determined based on the total amount of waste accepted for disposal during the course of the relevant month.  Contractor shall determine the appropriate fees due to the City, and shall forward, with appropriate documentation, payment of the appropriate amount by the twenty-fifth (25th) day after the last day of the relevant month.  Contractor shall provide the City with access to all tonnage and volume data so that the City may

#570434(Word)                    8

**P**olyengineering, Inc.

59

audit the Contractor's data to determine the accuracy of administrative fees delivered to the City. City shall not audit Contractor's tonnage more than one (1) time per calendar year. Contractor agrees to deliver to the City the administrative fee based on the following:

| | | |
|---|---|---|
| daily average is less than 400 tons per day | - | $0.75 per ton |
| daily average is between 401 - 700 tons per day | - | $1.15 per ton |
| daily average is between 701- 1000 tons per day | - | $1.85 per ton |
| daily average is between 1001 - 1500 tons per day | - | $2.25 per ton |
| daily average is between 1501 – 2500 tons per day | - | $3.00 per ton |
| daily average is greater than 2500 tons per day | - | $4.50 per ton |
| surcharge for special wastes | | $1.75 per ton |

The administrative fee shall be computed to be the greater amount of the actual volumes received based on the rates above and the minimum monthly administrative fee. These minimum payments are due regardless of the actual tonnage disposed in the landfill in a given month. The minimum administrative monthly fee rates and schedules shall be as following:

14.1 The daily average is computed on a monthly average, pursuant to ADEM regulations. The administrative fee is calculated by first determining the applicable daily average for said month, and then multiplying the total tons of waste received for said month by the corresponding per ton fee. The surcharge on special waste is in addition to any administrative fees based on the tonnage. Additionally, the Contractor shall be responsible for the payment of a minimum monthly administrative fee to City. The minimum monthly administrative fee shall be calculated by multiplying the landfill's average revenue for the previous six-month period by 2.5%, or it shall be $4500, whichever is greater. Regardless of revenue figures or disposal operations, the minimum monthly administrative fee owed shall never be less than $4500 per month. The first payment of such minimum fees, covering the month of May 2002, shall be due to the City on June 25, 2002.

14.2 Changes in the administrative fee rates stated above shall be calculated based on changes in the CPI. The Contractor shall increase the administrative fee to the City annually on each October 1, beginning with October 1, 2002. The percentage of increase shall be based on, and shall be the same as, the CPI. Regardless of the CPI, however, any such increases shall not exceed 4% annually. The base CPI shall be the CPI published for June 2001. On July 1 of the first year in which the landfill is operational and every twelve (12) month period thereafter, Contractor shall, notwithstanding the annual 4% cap, compute the percentage of increase in the administrative fee for the upcoming year based solely on the CPI.

14.3 In the event the Contractor is awarded a contract to receive a large volume of waste generated outside the State of Alabama for disposal at the

**Polyengineering, Inc.**

60

landfill, the Contractor shall pay the City a one-time royalty payment of $100,000. This royalty payment shall be due, at the discretion of the Contractor, either (i) in one up-front lump sum due the month the Contractor begins to dispose of the waste received pursuant to the large waste volume contract; or (ii) in regular monthly payments of the course of twelve months, commencing with the first month the Contractor begins to dispose of the waste received pursuant to the large waste volume contract. This royalty payment will only be paid once, and subsequent awards of large volume waste disposal contracts will not require further payments. For the purposes of this paragraph, "a contract to receive a large volume of waste generated outside the State of Alabama for disposal at the landfill" shall mean a contract that enables Contractor to increase the volume of waste it disposes at the landfill by 2,000 or more tons per day for any given period. In order to ensure compliance with this section, Contractor shall provide the City with a quarterly report detailing its current and forecasted out-of-state waste streams. This reporting requirement shall cease once the royalty payment is made.

      15.    Support for Local Industrial Development - Contractor shall, on a monthly basis, pay to the city and the city shall deposit $0.10 per ton of waste disposed at the landfill into a federally insured account which shall be held in the name of the City. At its discretion, the City may use funds in the above account for the sole purpose of recruiting, encouraging, or facilitating economic and industrial development in Brundidge and Pike County. The City shall not use funds in the account for any other purpose. Contractor may audit the City's withdrawals from the account no more than one (1) time per calendar year.

      16.    Entrance Road Maintenance and Repair - Contractor shall, on a monthly basis, pay to the city and the city shall deposit $0.10 per ton of waste disposed at the landfill into a federally insured account, which shall be held in the name of the City for the sole purpose of repairing and maintaining the entrance road. The City shall not use funds in the account for any other purpose. Contractor may audit the City's withdrawals from the account no more than one (1) time per calendar year

      17.    Notices - Notices of conditions or situations affecting the work to be performed under this Agreement shall be given in writing between designated operating personnel of the Contractor and the City. All notices shall be given in writing, to be delivered by certified mail, to the parties as set forth below:

          If to the Contractor, at:
          General Manager
          Brundidge Landfill, LLC
          P.O. Box 416
          Brundidge, AL. 36010

**P**olyengineering, Inc.

61

If to the City, at :

Mayor
City of Brundidge
Post Office Box 638
Brundidge, Alabama 36010

18.　　Waste Ownership - City agrees that all solid waste disposed of at the Contractor's sanitary landfill shall be the property of the Contractor. City shall make no claim of ownership to the solid waste deposited at the Contractor's sanitary landfill.

19.　　Taxes, Licenses and Fees – With the exception of the considerations given in Section 13, 14, 15, and 16, the City agrees not to assess or levy any taxes, licenses, fees or assessments on the Contractor's landfill that is not also a tax, license, fee or assessment that is assessed to other businesses in City of Brundidge. This provision shall also apply to the Contractor and any of its affiliates.

20.　　Severance Tax - With the exception of the considerations given in Section 13, 14, 15, and 16, the City agrees not to assess or levy any taxes, fees, riders, or other assessments, to the Contractor to recover fees for severance use of the Contractor's sanitary landfill capacity. City also agrees not to assess any surcharges to the revenues of the Contractor's sanitary landfill. Notwithstanding the solid waste authority contemplated in Section 37, the City also agrees not to place any governmental revenue collection function or authority on the Contractor.

21.　　Regulatory Approvals – Except as follows, the City agrees to support and exercise, as host government, any and all actions which is protective of public health and necessary to secure all necessary and appropriate regulatory permits for the development of the landfill. Following the public notice and public hearing required by Ala. Code 22-27-48(a), however, City reserves the right, as matter of public policy, to deny local approval if community input and comment on the proposed permit modification indicates that such modification is not in the best interest of the community. In such a case, the denial of local approval shall not be deemed an actionable breach of this Agreement but shall serve to cancel all parties' obligations, duties, and responsibilities pursuant to this Agreement. Accordingly, in such a case, Contractor agrees to make no legal claims against City with regard to such rejection of local approval.

22.　　Landfill Use – Notwithstanding Section 21, City agrees not to legislate any ordinance, law, statute or regulation, or to ask, solicit, encourage, any governmental entity to pass any legislation that restricts the usage of the Contractor's sanitary landfill for its intended use as a sanitary landfill for the disposal of non-hazardous and non-infectious solid waste from the above stated wasteshed.

23.　　Local Legislation - The City agrees not to enact or adopt any statute, ordinance, resolution, rule or regulation governing the operation of the landfill which is

**P**olyengineering, Inc.

62

more stringent than those imposed by ADEM or the Environmental Protection Agency (EPA) or which prevents the Contractor from depositing non-hazardous and non-infectious solid waste from the above stated wasteshed in the landfill.

    24.   Support for Annexation – Should Contractor expand the landfill onto land beyond the current municipal limits of the City, Contractor agrees to support efforts by the City to annex such land within the City's limits.

    25.   Indemnification - Contractor does hereby indemnify and hold the City harmless from all liens, claims, judgments, liabilities, causes of action, assessments, fines, or attorney's fees incurred or caused by acts or omissions of Contractor at Contractor's landfill for the life of the landfill to include the post closure period, including but not limited to, any fines, assessments, or penalties made or levied by the Environmental Protection Agency, the Alabama Department of Environmental Management, or any other regulatory agency in connection with the operation of said landfill. The City shall have the right to select an attorney or attorneys to defend it against any such liens, claims, judgments, liabilities, causes of action, assessments, firms, or attorney's fees.

    25.1   Contractor hereby agrees to indemnify, hold harmless and defend the City from and against any claims, actions, suits, damages, liabilities, costs and/or expenses (including attorney's fees) resulting from personal injury (including death) to any party, or damage to the property thereof, in any manner caused by, arising from or incidental to the services to be performed under this Agreement, except any claims which are caused by the negligence of the City. The City shall have the right to select an attorney or attorneys to represent it with respect to any such claim.

    25.2   Contractor shall indemnify and hold harmless the City against and in respect of any loss, damage, liability, cost and expense, including reasonable attorneys' fees and amounts paid in settlement or otherwise suffered or incurred by the City by reason of or arising out of Contractor's (i) failure to comply with applicable federal, state or local laws or regulations concerning the environment, as now existing or as hereafter adopted, or (ii) failure to comply with its responsibilities and duties under this Agreement. The City shall have the right to select an attorney or attorneys to represent it with respect to any such claim.

    25.3   City hereby agrees to indemnify, hold harmless and defend the Contractor from and against any claims, actions, suits, damages, liabilities, costs and/or expenses (including attorney's fees) resulting from personal injury or death to any party, or damage to the property thereof arising from any act or omission of the City in the transportation of solid waste to or from the Contractor's sanitary landfill, except any claims which are caused by the negligence of the Contractor.

    26.   Performance Bond – Once the Contractor reaches waste volumes of 1500 tons per day, the Contractor shall increase the amount of its existing $500,000

Polyengineering, Inc.

63

performance bond to an amount of $1,500,000 guaranteeing the continued faithful performance of this contract. The bond shall be from a surety acceptable to the City.

27.    Resource Recovery - City agrees that Contractor may investigate the feasibility of utilizing solid waste or its byproducts for the purpose of recovering any resource from the waste that the Contractor desires.

28.    Local Plan - The City represents and warrants that it has adopted a local Solid Waste Management Plan and that this Agreement is consistent with such Solid Waste Plan. The City has taken all action necessary or appropriate in order for the City to carry out the obligations and actions described herein, with the exception of the local approval requirements referenced in Section 21 of this Agreement.

29.    Severability - In case any one or more of the provisions of this Agreement shall be held to be invalid, illegal, unconstitutional, void or unenforceable, the remainder of this contract shall remain in full effect until the expiration date.

30.    Amendments and Assignments - This Agreement may be amended only by any instrument in writing signed by both parties to this Agreement. Both parties agree that neither party may assign any portion of this Agreement or in its entirety, without the prior written concurrence of both parties.

31.    Right of Inspection - The City agrees and grants that the Contractor has the authority to inspect any vehicle, load or volume of waste brought to the Contractor's sanitary landfill for violations of Federal, State, or local laws, statutes, ordinances, rules, regulations or permit conditions and acknowledges that Contractor can reject any container or volume of waste that Contractor reasonably believes fails to comply with such laws, statutes, ordinances, rules, regulations, permit conditions or Contractor's operating procedures. It shall be the responsibility of the transporter to manage the rejected load in a prudent and legal manner.

32.    Hazardous and Infectious Waste - Both parties hereto agree that the landfill is not licensed, permitted or intended for the disposition of hazardous or infectious wastes. The Contractor agrees that it will not accept any hazardous or infectious wastes, containers, liquids or any substances prohibited from disposition in sanitary landfills by Federal or State law, rule or regulation.

33.    Wastewater Acceptance - City understands that the Contractor requires an outlet for wastewater treatment of the leachate from the Contractor's landfill. City agrees to accept leachate from the Contractor for treatment at the City's wastewater treatment facility ("WWTF") subject to the requirements and limitations set forth below:

33.1.    Acceptance of Contractor's said leachate shall be contingent upon approval and permitting of said acceptance by the Alabama Department of Environmental Management through issuance of a State Indirect Discharge (SID)

#570434(Word)                     13

**Polyengineering, Inc.**

64

Permit to Contractor. All costs associated with obtaining and maintaining said SID Permit shall be the responsibility of the Contractor.

33.2 Contractor understands that City's acceptance of said leachate is contingent upon the following general discharge limitations that apply to all significant industrial users of the Brundidge sewer system:

33.2.1 The leachate discharge shall not overload, upset, or otherwise inhibit the operation of the City WWTF.

33.2.2 The leachate discharge shall not result in a "pass-through" of one or more pollutants through the WWTF that would cause the WWTF to violate its NPDES Permit whether by increased toxicity or other factors.

33.2.3 The leachate discharge shall not contaminate sludge from the WWTF to such an extent as to cause the sludge to be placed in a less desirable classification under EPA's 503 Regulations than would otherwise be the case absent discharge.

33.3 Contractor shall be responsible for installing flow-measuring equipment to enable City to accurately ascertain the volume of leachate discharged to the WWTF, and the City shall have the right to audit such equipment.

33.4 Contractor shall comply with all terms and conditions of SID; Contractor shall perform monitoring in accordance with the SID Permit used by ADEM and shall furnish copies of all monitoring reports to the City.

33.5 The Contractor shall pay the City for wastewater treatment services at rates determined by the City to be consistent with the City's ADEM and EPA approved sewer user charge system as is periodically updated by the City. However, in no case shall the charge for wastewater treatment services be less than $.03 per gallon.

This provision shall survive the termination of this Agreement and any renewal of this Agreement for a period of one (1) year after the effective date of termination.

34. Contractor's Status - Contractor is an independent contractor and not an agent or representative of the City and nothing herein shall be construed as creating any principal- agent or master-servant relationship between the City and Contractor.

35. ADEM Permit - Contractor agrees to use its due diligence and best efforts to expeditiously obtain and maintain in good standing all necessary environmental permits. Should Contractor, after having exercised its due diligence and best efforts to obtain any necessary approvals from ADEM to open and operate the landfill, be unable to obtain all

#570434(Word)                    14

**Polyengineering, Inc.**

65

such approvals, Contractor may, at its sole option, terminate this Agreement. Should such termination occur, however, no payments previously made to the City pursuant to this Agreement shall be considered refundable to Contractor and Contractor hereby agrees not to seek repayment of same. The City agrees that it will exert its best efforts in assisting the Contractor in obtaining such permits and/or approvals from ADEM, notwithstanding the provisions of Sections 10 and 21.

36.    Sale or Transfer of Landfill to Third Party – Contractor shall not sell the landfill to a third party, or undergo a corporate reorganization that vests control of the landfill in some entity other than Brundidge Landfill, LLC, without the express prior approval of the City. In such instances, Contractor shall provide the City with the option and right of first refusal to purchase the landfill from Contractor. Furthermore, it is the desire of the City that the terms and conditions of this Contract shall be binding on any subsequent owners of the landfill. Accordingly, should the ownership of the landfill be transferred, Contractor agrees to specifically and expressly transfer the obligations, responsibilities, terms and conditions under which it operates pursuant to this Contract to the purchaser or new owner of the landfill.

37.    Assignment of Contract to Solid Waste Authority - Notwithstanding the provisions of paragraph 30, "Amendments and Assignments," in the event that the City of Brundidge elects to form a solid waste disposal authority pursuant to Ala. Code section 11-89A-1 et seq. or similar relevant statute, Contractor agrees that the City may assign this Agreement, and its rights and obligations thereunder, to such authority and also agrees to amend the Agreement at such time to change the term of the Agreement to a period of twenty-five years or the life of the landfill, whichever may be greater. Contractor shall not oppose such a transfer and shall continue to be obligated under this Agreement to such authority.

38.    Breach - In the event either party fails to materially perform in accordance with the terms of this Agreement, the injured party shall give notice of said breach to the breaching party in writing by certified mail outlining the deficiency in question. The breaching party shall have a period of thirty (30) days from the receipt of said notice to correct said deficiency and regain compliance under the contract. In the event no correction is made within said thirty (30) day period, and in the event no arbitration has been commenced, then the injured party, at its sole option, may terminate this Agreement because of breaching party's breach thereof and said injured party shall have all remedies enumerated herein and available under the laws of the State of Alabama.

39.    Force Majeure - The obligations of City and Contractor are subject to strikes, riots, wars, fires, acts of God, accidents, governmental orders and regulations and other similar or different contingencies beyond the reasonable control of City or the Contractor, as the case may be. This Force Majeure provision, however, explicitly does not excuse Contractor's obligation to make the Initial Royalty payment specified in Section 14.1 in the event of Contractor's failure to obtain the necessary solid waste management permit from ADEM.

#570434(Word)                    15

**Polyengineering, Inc.**

66

40. Representations

40.1    The City makes the following representations and warranties as the basis for its undertakings pursuant to this Agreement, notwithstanding the provisions and limitations of Section 21:

40.1.1 The City has the power and authority to enter into the transactions contemplated by this Agreement and to fulfill and carry out its obligations hereunder; and

40.1.2 The execution and delivery of this Agreement on its part have been duly authorized by a resolution duly adopted by its City Council and by all other necessary actions.

40.1.3 This Agreement constitutes the legally binding obligations of the City. Notwithstanding the foregoing, in the event any court in the State of Alabama shall declare this Agreement void, for any reason, the City shall not be responsible to Contractor for any fees or expenses which have not already been paid to Contractor at the time such judgment is entered.

40.2    The Contractor makes the following representations and warranties as the basis for its undertakings pursuant to this agreement:

40.2.1 The Contractor is a limited liability corporation under the laws of Delaware and has the power to enter into and to perform and observe the agreement and covenants on its part contained in this agreement; and,

40.2.2 The Contractor has the power to fulfill and carry out the provisions of this agreement; and

40.2.3 The execution and delivery of this Agreement on the part of the Contractor have been duly authorized by all necessary corporate action.

41.    Jurisdiction - This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama except as otherwise necessary to comply with the regulations and orders of the United States Environmental Protection Agency, in which event the laws of the United States shall govern the interpretation and construction of this Agreement.

42.    Entire Agreement and Effective Date - This Agreement contains the entire agreement of the parties and supersedes all prior negotiations, agreements and oral understandings between the parties hereto. This Agreement shall become effective, for the purposes of the application process for the necessary permits and approvals from state

#570434(Word)                              16

**Polyengineering, Inc.**

67

regulatory bodies, immediately upon its execution in full by City and the Contractor and shall be binding upon and shall inure to the benefit of City and the Contractor, and the Contractor's successors and assigns.

WITNESS OUR HANDS AND SEALS on the day and date first entered above.

ATTESTED:                                    CITY OF BRUNDIDGE, ALABAMA

By: _____                 By: _____
Its City Clerk                                   Its Mayor

ATTESTED:                                    BRUNDIDGE LANDFILL, LLC

By: _____                 By: _____
Its Secretary                                    Its: *Executive Vice President*

#570434(Word)                    17

**Polyengineering, Inc.**



BRENDA MEADOWS PEACOCK
CLERK CIRCUIT/DISTRICT COURT
120 WEST CHURCH ST.
TROY, ALABAMA 36081

Allied Waste North America, Inc.
% The Corporation Company
2000 Interstate Park Dr.
Ste. 204
Montgomery, AL 36109



CERTIFIED MAIL

7004 1160 0004 7050 8192



UNITED STATES POSTAGE
PITNEY BOWES
02 1P      $ 005.920
0002512393  OCT 26 2006
MAILED FROM ZIP CODE 36081

# ALABAMA SJIS CASE DETAIL

**WHITE**

**PREPARED FOR: ANGIE PUCKETT**


**alacourt.com**

County: **55**    Case Number: **CV 2006 000275 00**    Court Action:

Style: **CITY OF BRUNDIDGE, ALABAMA  VS  BRUNDIDGE LANDFILL, LLC, ETALS**

## Case

### Case Information

| | |
|---|---|
| County: | 55 - PIKE |
| Case Number: | CV 2006 000275 00 |
| JID: | JWK JEFFERY W KELLEY |
| Trial: | J |
| Style: | CITY OF BRUNDIDGE, ALABAMA  VS  BRUNDIDGE LANDFILL, LLC, ETALS |
| Filed: | 10/26/2006 |

### Case Type

| | |
|---|---|
| Code: | TOXX |
| Type: | OTHER TORT |
| Track | |
| Status: | A |
| Plaintiffs: | 001 |
| Defendants: | 003 |

### Court Action

| | |
|---|---|
| DJID: | |
| Court Action: | |
| Judgment For: | |
| Trial days: | 0 |
| Lien: | 0 |

### Damages

| | |
|---|---|
| Amount: | $0.00 |
| Compensatory: | $0.00 |
| Punitive: | $0.00 |
| General: | $0.00 |
| None: | |

### Other Actions

| | | |
|---|---|---|
| Con Date: | Cont #: | Why: |
| RevJmt: | Admin Date: | Why: |
| Appeal Date: | Court: | Case: |
| Mistrial: | | |
| TBNV2: | DSDT: | DTYP: |

### Comments

Comment 1:
Comment 2:

## Settings

### Court Dates

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 1: | | | - | |
| 2: | | | - | |
| 3: | | | - | |
| 4: | | | - | |

## Party 1 - C 001 - CITY OF BRUNDIDGE, ALABAMA

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | C 001 | Name: | CITY OF BRUNDIDGE, ALABAMA | Type: | G Government |
| Index: | Y | Alt Name: | | JID: | JWK |
| SSN: | | DOB: | | Sex: | Race: |
| Address 1: | | | Address 2: | | |
| Phone: | 334 | City: | State: AL | Zip: 00000-0000 | Country: US |

### Attorneys

| | | | | | | |
|---|---|---|---|---|---|---|
| Attorney 1: | CAL014 | Name: | CALHOUN RICHARD F | City: TROY | State: AL |
| Attorney 2: | CAM006 | Name: | CAMPBELL ANDREW P | City: BIRMINGHAM | State: AL |


**EXHIBIT**
B



Attorney 3: **SMI209**   Name: **GIDIERE CAROLINE SMITH**          City: **BIRMINGHAM**   State: **AL**
Attorney 4:          Name:                                      City:                  State:
Attorney 5:          Name:                                      City:                  State:
Attorney 6:          Name:                                      City:                  State:

### Service Information

| Issued: | Type: | Reissue: | Type: |
|---|---|---|---|
| Return: | Type: | Return: | Type: |
| Service: | Type: | Service On: | By: |
| Answer: | Type: | NS not: | NA not: |
| Warrant | Type: | Arrest: | |

### Court Action

CACT:              Date:            For             Exempt:
Amount:   **$0.00**   Cost:  **$0.00**   Other:  **$0.00**   Satisfied:
Comment:

## Party 2 - D 001 - BRUNDIDGE LANDFILL, LLC

### Party Information

Party:   **D 001**   Name:   **BRUNDIDGE LANDFILL, LLC**                    Type:  **B Business**
Index:   **Y**       Alt Name:                                            JID:   **JWK**
SSN:                 DOB:                 Sex:                             Race:
Address 1: **%CORPORATION CO/STE.204**   Address 2: **2000 INTERSTATE PARK DR**
Phone:   **334**     City:  **MONTGOMERY**   State:   **AL**   Zip:  **36109-0000**   Country:  **US**

### Attorneys

| Attorney 1: | Name: | City: | State: |
|---|---|---|---|
| Attorney 2: | Name: | City: | State: |
| Attorney 3: | Name: | City: | State: |
| Attorney 4: | Name: | City: | State: |
| Attorney 5: | Name: | City: | State: |
| Attorney 6: | Name: | City: | State: |

### Service Information

Issued: **10/27/2006**   Type:  **C Certified mail**   Reissue:       Type:
Return:                  Type:                            Return:        Type:
Service: **10/30/2006**  Type:  **C Certified Mail**   Service On:    By:
Answer:                  Type:                            NS not:        NA not:
Warrant                  Type:                            Arrest:

### Court Action

CACT:              Date:            For             Exempt:
Amount:   **$0.00**   Cost:  **$0.00**   Other:  **$0.00**   Satisfied:
Comment:

## Party 3 - D 002 - ALLIED WASTE INDUSTRIES, INC

### Party Information

Party:   **D 002**   Name:   **ALLIED WASTE INDUSTRIES, INC**             Type:  **B Business**
Index:   **Y**       Alt Name:                                            JID:   **JWK**
SSN:                 DOB:                 Sex:                             Race:
Address 1: **%CORPORATION TRUST CO**     Address 2: **1209 ORANGE ST**
Phone:   **334**     City:  **WILMINGTON**   State:   **DE**   Zip:  **19801-0000**   Country:  **US**

### Attorneys

Attorney 1:          Name:                                      City:                  State:

| | | | | | | |
|---|---|---|---|---|---|---|
| Attorney 2: | Name: | | | City: | State: |
| Attorney 3: | Name: | | | City: | State: |
| Attorney 4: | Name: | | | City: | State: |
| Attorney 5: | Name: | | | City: | State: |
| Attorney 6: | Name: | | | City: | State: |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: 10/27/2006 | Type: | C Certified mail | Reissue: | Type: |
| Return: | Type: | | Return: | Type: |
| Service: 10/31/2006 | Type: | C Certified Mail | Service On: | By: |
| Answer: | Type: | | NS not: | NA not: |
| Warrant | Type: | | Arrest: | |

### Court Action

| | | | |
|---|---|---|---|
| CACT: | Date: | For | Exempt: |
| Amount: $0.00 | Cost: $0.00 | Other: $0.00 | Satisfied: |
| Comment: | | | |

## Party 4 - D 003 - ALLIED WASTE NORTH AMERICA, INC

### Party Information

| | | | | | |
|---|---|---|---|---|---|
| Party: | D 003 | Name: | ALLIED WASTE NORTH AMERICA, INC | | Type: | B Business |
| Index: | Y | Alt Name: | | | JID: | JWK |
| SSN: | | DOB: | | Sex: | Race: |
| Address 1: | %CORPORATION CO/STE.204 | | | Address 2: | 2000 INTERSTATE PARK DR |
| Phone: | 334 | City: | MONTGOMERY | State: AL | Zip: 36109-0000 | Country: US |

### Attorneys

| | | | | | |
|---|---|---|---|---|---|
| Attorney 1: | Name: | | | City: | State: |
| Attorney 2: | Name: | | | City: | State: |
| Attorney 3: | Name: | | | City: | State: |
| Attorney 4: | Name: | | | City: | State: |
| Attorney 5: | Name: | | | City: | State: |
| Attorney 6: | Name: | | | City: | State: |

### Service Information

| | | | | | |
|---|---|---|---|---|---|
| Issued: 10/27/2006 | Type: | C Certified mail | Reissue: | Type: |
| Return: | Type: | | Return: | Type: |
| Service: 10/30/2006 | Type: | C Certified Mail | Service On: | By: |
| Answer: | Type: | | NS not: | NA not: |
| Warrant | Type: | | Arrest: | |

### Court Action

| | | | |
|---|---|---|---|
| CACT: | Date: | For | Exempt: |
| Amount: $0.00 | Cost: $0.00 | Other: $0.00 | Satisfied: |
| Comment: | | | |

## Case Action Summary

| Date | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 10/27/2006 | 10:43:33 | FILE | FILED THIS DATE: 10/26/2006         (AV01) | JAS |
| 10/27/2006 | 10:43:34 | ORIG | ORIGIN: INITIAL FILING         (AV01) | JAS |
| 10/27/2006 | 10:43:35 | STAT | CASE ASSIGNED STATUS OF: ACTIVE         (AV01) | JAS |
| 10/27/2006 | 10:43:36 | TDMJ | JURY TRIAL REQUESTED         (AV01) | JAS |
| 10/27/2006 | 10:43:37 | ASSJ | ASSIGNED TO JUDGE: JEFFERY W KELLEY         (AV01) | JAS |
| 10/27/2006 | 10:45:18 | PART | CITY OF BRUNDIDGE, ALABAMA ADDED AS C001    (AV02) | JAS |
| 10/27/2006 | 10:45:19 | ATTY | LISTED AS ATTORNEY FOR C001: CALHOUN RICHARD F | JAS |
| 10/27/2006 | 10:45:20 | ATTY | LISTED AS ATTORNEY FOR C001: CAMPBELL ANDREW P | JAS |

| 10/27/2006 | 10:45:21 | ATTY | LISTED AS ATTORNEY FOR C001: GIDIERE CAROLINE SMI | JAS |
| 10/27/2006 | 10:46:59 | PART | BRUNDIDGE LANDFILL, LLC ADDED AS D001      (AV02) | JAS |
| 10/27/2006 | 10:47:47 | PART | ALLIED WASTE INDUSTRIES, INC ADDED AS D002  (AV02) | JAS |
| 10/27/2006 | 10:48:30 | PART | ALLIED WASTE NORTH AMERICA, INC ADDED AS D003 | JAS |
| 10/27/2006 | 10:50:45 | SUMM | SUMMONS ISSUED ON 10/27/2006 FOR D001 | JAS |
| 10/27/2006 | 10:50:50 | SUMM | SUMMONS ISSUED ON 10/27/2006 FOR D002 | JAS |
| 10/27/2006 | 10:50:55 | SUMM | SUMMONS ISSUED ON 10/27/2006 FOR D003 | JAS |
| 10/31/2006 | 3:25:32 | SERC | SERVICE OF CERTIFIED MAI ON 10/30/2006 FOR D001 | AJA |
| 10/31/2006 | 3:25:44 | SERC | SERVICE OF CERTIFIED MAI ON 10/30/2006 FOR D003 | AJA |
| 11/07/2006 | 10:15:48 | SERC | D002 SERVED CERTIFIED MAIL ON 10/31/2006 | JAS |

*END OF THE REPORT*

<u>**AFFIDAVIT OF JO LYNN WHITE**</u>

STATE OF ARIZONA )
)
MARICOPA COUNTY )

On this day appeared before me, the undersigned notary public, Jo Lynn White, who is personally known to me and who upon his oath deposed and stated as follows:

1.      My name is Jo Lynn White. I am the Secretary of Brundidge Landfill, LLC. I am over the age of 19 years, of sound mind, suffer no legal disabilities, and am fully competent in all respects to make this affidavit. I have personal knowledge of the matters stated herein, and such matters are true and correct to the best of my knowledge.

2.      In my capacity as Secretary, I am familiar with the corporate formation papers for Brundidge Landfill, LLC.

3.      Attached as Exhibit 1 is a true and correct copy of the Operating Agreement for Brundidge Landfill, LLC, which is maintained and kept in the ordinary course of business.

Further affiant sayeth not.

_____
Jo Lynn White

Subscribed and sworn to before me this
____ day of November, 2006

_____
Notary Public

My Commission Expires: _9/17/08_

Notary Public State of Arizona
Maricopa County
Susanne A Webb
Expires September 17 2008

**EXHIBIT**
1

## OPERATING AGREEMENT
## OF BRUNDIDGE LANDFILL, LLC

This Operating Agreement (the "Agreement") of Brundidge Landfill, LLC (the "Company") is executed as of October 5, 1999, by Allied Waste North America, Inc., a Delaware corporation, the sole member of the Company (the "Member"), and shall bind the Member, the Company, and any other person who may acquire any interest in the Company.

### SECTION 1. DEFINITIONS; THE COMPANY

1.1    Definitions.    Capitalized words and phrases used in this Agreement and not otherwise defined herein shall have the meanings set forth in Section 7.6 hereof.

1.2    Formation.    The Company has been formed as a limited liability company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement and the Certificate of Formation.

1.3    Name.    The name of the Company is Brundidge Landfill, LLC.    All business of the Company shall be conducted in the Company name.    The Company shall hold its property in the name of the Company.

1.4    Purpose.    The purpose of the Company is primarily to engage in and conduct the business of owning and operating landfills and providing waste transportation services, and to engage in any other activity permitted under Delaware law and the laws of any jurisdiction in which the Company may do business.

1.5    Office.    The registered office of the Company within the State of Delaware shall be Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle.    The registered office may be changed to any other place within the State of Delaware upon the consent of the Member.    The Company may maintain a registered office in any state within which it does business at any location approved by the Member.

1.6    Registered Agent for Service of Process.    The name and address of the registered agent for service of legal process on the Company in Delaware are The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware.    The Company's agent for service of legal process may be changed upon the consent of the Member.

1.7    Certificate of Formation.    The Member shall file any amendments to the Certificate of Formation deemed necessary by them to reflect amendments to this Agreement adopted by the Member in accordance with the terms hereof.    Upon the approval of any amendments thereto, by the Member in accordance with this Agreement, the Member or a designee of the Member shall be authorized to execute and file such instruments with the appropriate state agencies.

PHX/CSKINNER/998954.1/11379.192

**EXHIBIT**

1

## SECTION 2. MEMBER; CAPITAL CONTRIBUTIONS; LOANS

2.1    Member.  The name and address of the sole Member are:  Allied Waste North America, Inc., a Delaware corporation, 15880 N. Greenway Hayden Loop, Suite 100, Scottsdale, Arizona 85260.

2.2    Contributions of Member.  The Member shall contribute to the Company the cash or other assets set forth in Exhibit A to this Agreement, which is incorporated herein by this reference.  The Member shall not be obligated to make additional Capital Contributions to the Company.

2.3    Member Loans.  The Member may make loans ("Member Loans") to the Company, which shall bear interest and be repaid on such reasonable terms and conditions as may be determined by the Member.  The Member shall not be required to make a Member Loan unless the Member has agreed to make such Member Loan.

## SECTION 3. DISTRIBUTIONS

During the term of the Company, cash and property shall be distributed periodically and to the Member in its sole discretion.  No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company.

## SECTION 4. MANAGEMENT

4.1    General Management Structure.  Unless specifically provided otherwise herein, all decisions and actions concerning the Company and its affairs, and all matters requiring the consent or approval of the Member under this Agreement, shall be made within the sole discretion of the Member.  Any party dealing with the Company shall be permitted to rely absolutely on the signature of the Member as binding on the Company.

4.2    Delegation of Authority to Officers.  The Member may designate one or more Persons as officers of the Company.  The officers shall have the authority to act for and bind the Company to the extent of the authority granted to them herein or in resolutions duly adopted by the Member on behalf of the Company.  The officers of the Company may include a president, vice presidents, an executive vice president, a secretary, a treasurer, and such other officers as the Member deems appropriate.  The officers of the Company will be entitled to such compensation for their services as the Member may reasonably determine from time to time.  Unless otherwise specified by the Member, the following officers shall have the authority to engage in the activities set forth with respect to their respective offices:

4.2.1    President.  The President shall, subject to the control of the Member, have general supervision of the business of the Company and shall see that all orders and resolutions of the Member are carried into effect.  The President shall execute all bonds, mortgages, contracts and

other instruments of the Company, except where required or permitted by law to be otherwise signed and executed and except that the other officers of the Company may sign and execute documents when so authorized by this Agreement, the Member, or the President. The President shall also perform such other duties and may exercise such other powers as from time to time may be assigned to him by this Agreement or by the Member.

4.2.2  Vice Presidents. At the request of the President or in his absence or in the event of his inability or refusal to act, the Executive Vice President, if there is one acting, or in the absence of an Executive Vice President, the Vice President or the Vice Presidents if there are more than one, shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. Each Vice President shall perform such other duties and have such other powers as the President from time to time may prescribe.

4.2.3  Secretary. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

4.2.4  Treasurer. The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Member. The Treasurer shall disburse the funds of the Company as may be ordered by the Member, taking proper vouchers for such disbursements, and shall render to the President, from time to time, when the Member so requires, an account of all his transactions as Treasurer and of the financial condition of the Company. If required by the Member, the Treasurer shall give the Company a bond in such sum and with such surety or sureties as shall be satisfactory to the Member for the faithful performance of the duties of his office and for the restoration to the Company, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Company.

4.2.5  Assistant Secretaries. Except as may be otherwise provided in this Agreement, Assistant Secretaries, if there are any, shall perform such duties and have such powers as from time to time may be assigned to them by the Member, the President, any Vice President, if there are any appointed, or the Secretary, and in the absence of the Secretary or in the event of his disability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

4.2.6  Assistant Treasurers. Assistant Treasurers, if there are any, shall perform such duties and have such powers as from time to time may be assigned to them by the Member, the President, any Vice President, if there are any appointed, or the Treasurer, and in the absence of the Treasurer or in the event of his disability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions

PHX/CSKINNER/998954.1/11379.192

3

upon the Treasurer. If required by the Member, an Assistant Treasurer shall give the Company a bond in such sum and with such surety or sureties as shall be satisfactory to the Member for the faithful performance of the duties of his office and for the restoration to the Company, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Company.

4.2.7  Other Officers.  Such other officers as the Member may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Member. The Member may delegate to any officer of the Company the power to choose such other officers and to prescribe their respective duties and powers.

4.3  Indemnification.  The Company, its receiver or its trustee shall defend, indemnify and save harmless the Member and its officers and any officers of the Company (the "Indemnified Parties") from and against all losses, claims, costs, liabilities and damages incurred by them by reason of any act performed or omitted to be performed by them in connection with the business of the Company, including attorneys' fees incurred by them in connection with the defense of any action based on any such act or omission; provided, however, no Indemnified Party shall be indemnified from any liability for fraud, bad faith, willful misconduct or gross negligence.

4.4  Meetings.  No annual or special meetings of the Member shall be required. Any action required or permitted to be taken at any meeting may be taken without a meeting if written consent setting forth the action to be taken is signed by the Member.

## SECTION 5. BOOKS AND RECORDS

5.1  Books and Records.  The Company shall maintain and preserve at its office all accounts, books and other relevant Company documents. The books of account of the Company shall be prepared and maintained on the same basis and in a manner consistent with the records of the Member.

5.2  Fiscal Year.  The fiscal year of the Company shall be the same as the fiscal year of the Member.

5.3  Bank Accounts.  The funds of the Company shall be maintained in a separate account or accounts in the name of the Company.

## SECTION 6. DISSOLUTION AND TERMINATION

6.1  Dissolution.  The Company shall dissolve upon the first to occur of any of the following events:

(a)  The sale of all or substantially all of the Company's assets and the collection

of the proceeds of such sale;

      (b)     The election by the Member to dissolve the Company; or

      (c)     The entry of a decree of dissolution under § 18-802 of the Act.

6.2    Winding Up.

      (a)     General.  Following the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but the Company's separate existence shall continue until articles of dissolution have been filed with the Delaware Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

      (b)     Liquidation and Distribution of Assets.  The Member (or its authorized successor in interest) shall be responsible for overseeing the winding up and liquidation of the Company and shall take full account of the Company's liabilities and assets upon dissolution.  Any assets not required to discharge any liabilities of the Company shall be distributed to the Member. Upon the completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.  The Company shall comply with any applicable requirements of the Act pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

6.3    Articles of Dissolution.  When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed to the Member, articles of dissolution shall be executed and filed by the Member with the Delaware Secretary of State.

## SECTION 7. MISCELLANEOUS

7.1    Binding Effect.  Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Member and its heirs, legatees, legal representatives, successors, transferees and assigns.

7.2    Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

7.3    <u>Severability</u>.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

7.4    <u>Variation of Pronouns</u>.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require.

7.5    <u>Governing Law</u>.  The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Member.

7.6    <u>Glossary</u>.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section:

"<u>Act</u>" means the Delaware Limited Liability Company Act, as set forth in Del. Code Ann. Tit. 6, § 18-101, <u>et</u>. <u>seq</u>.,  as amended from time to time (or any corresponding provisions of succeeding law).

"<u>Agreement</u>" means this Operating Agreement, as amended from time to time.  Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

"<u>Articles of Organization</u>" has the meaning given that term in Section 1.7 hereof.

"<u>Capital Contribution</u>" means the amount of money and the net fair market value of property (other than money) contributed to the Company by the Member.

"<u>Company</u>" means the limited liability company formed pursuant to this Agreement and any limited liability company continuing the business of this Company in the event of dissolution as herein provided.

"<u>Member</u>" means any Person identified as a Member in the heading to this Agreement.  If any Person is admitted as a Substituted Member pursuant to the terms of this Agreement, "Member" shall also be deemed to refer to such Person.

"<u>Member Loans</u>" has the meaning given that term in Section 2.3 hereof.

"<u>Person</u>" means any individual, partnership, corporation, limited liability company, trust or other entity.

7.7    <u>No Third-Party Beneficiaries</u>.  No term or provision of this Operating Agreement is intended to or shall be for the benefit of any Person not a party hereto, and no such other Person shall have any right or cause of action hereunder.

IN WITNESS WHEREOF, the undersigned has entered into this Agreement as of the date first above written.

> Allied Waste North America, Inc.,
> a Delaware corporation
>
> By:_____
> Steven M. Helm, Vice President - Legal

**EXHIBIT A**

| Name and Address of Member | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Allied Waste North America, Inc. 15880 North Greenway Hayden Loop Suite 100 Scottsdale, Arizona 85260 | $100.00 | 100% |

51

# Appendix J - Copy of Agreement

*CITY*
*ORIGINAL*

STATE OF ALABAMA    )
                    )
PIKE COUNTY         )

## AGREEMENT

THIS AGREEMENT, made and entered into this 1st day of May 2002 (the "Effective Date"), by and between the City of Brundidge, Alabama, a political subdivision of the State of Alabama, acting by and through its governing body, the City Council of the City of Brundidge, hereinafter referred to as the "City", and Brundidge Landfill, LLC, a Delaware limited liability company, hereinafter referred to as the "Contractor."

## WITNESSETH:

WHEREAS, Contractor and the City desire that Contractor modify existing Alabama Department of Environmental Management solid waste management permit No. 55-07 to operate a landfill within the City which would guarantee the disposal of the City of Brundidge's non-hazardous solid waste in the City of Brundidge at a Subtitle D Landfill Facility; and,

WHEREAS, the proposed permit modification will increase both said landfill's service area to encompass certain out-of-state areas and the daily maximum volume of waste permitted to be disposed in the landfill; and,

WHEREAS, such permit modification can only take place following the City's local approval considered and bestowed pursuant to Ala. Code 22-27-48(a); and,

WHEREAS, the City Council is ultimately responsible for providing for the disposal of non-hazardous solid waste generated within its jurisdiction; and,

WHEREAS, the Contractor desires to assist the City in solving the problems associated with non-hazardous solid waste disposal; and,

WHEREAS, the City has chosen under state law, Ala. Code §22-27-47(a), to develop and to submit its own solid waste management plan for implementation within its city limits, and this Agreement is an integral part of the development and submission of the City's solid waste management plan; and,

WHEREAS, the Contractor desires to develop and operate a sanitary landfill which has state of the art environmental safeguards, which include a leachate collection system, a composite liner system, storm water control and filtration system, perimeter gas monitoring probes, groundwater-monitoring wells and waste stream monitoring that will meet or exceed all current and future applicable state and federal rules and regulations for the operation of a sanitary landfill; and,

#570434(Word)

Polyengineering, Inc.

EXHIBIT

A

52

WHEREAS, the City has determined that the Contractor's proposed landfill shall provide the City with an environmentally secure location to dispose of non-hazardous and non-infectious solid waste which will promote economic growth and is a logical alternative to the City's disposal practice; and,

WHEREAS, the Contractor and the City anticipate that the sanitary landfill will receive at least a monthly average of 1,200 tons per day of non-hazardous and non-infectious solid waste; and,

WHEREAS, the City desires that the Contractor's proposed increased operations at the sanitary landfill will commence as soon as possible; and,

WHEREAS, the City desires that the road segment between U.S. Highway 231 and the landfill's entrance (Clean Water Drive, hereinafter referred to as "the entrance road") be maintained and kept as litter-free as reasonably possible given the City's desire to attract new business to adjacent property; and,

WHEREAS, the City has determined that entering into this agreement is in the best interest of its citizens.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein, and for other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged by each party hereto, the City Council of the City of Brundidge and Contractor do hereby agree as follows:

1.    Definitions - All words, terms, phrases, etc., used in this Agreement that relate to solid waste management and/or sanitary landfill design, permitting, construction, operation and management shall be the same words, terms, phrases, etc., as used and defined in the Solid Wastes Disposal Act (Alabama Acts 1982, No. 82-612) codified at 22-27-1, et. seq., Code of Alabama (1975), as amended from time to time and the regulations promulgated thereunder.

2.    Scope of Work - Contractor agrees to furnish all labor, material, equipment and land for the disposal of non-hazardous and non-infectious solid waste in a landfill wholly or partially within the City of Brundidge and owned and operated by Contractor. All costs of the landfill operation will be borne by the Contractor.

3.    Term - This Agreement shall be for a term of three (3) years, commencing on the date of the execution of this Agreement. City shall have the right to renew this Agreement for successive additional terms of three (3) years, without limitation. Unless the City shall give written notice of its desire not to renew to the Contractor at least three (3) months prior to the expiration date of the term hereof or any renewal term, then this contract shall be automatically renewed for an additional term of three (3) years.

4.    Hours – Contractor shall have the landfill open to the City between the hours of 4:00 a.m. and 5:00 p.m., local time, Monday through Friday, and 4:00 a.m. to

#570434(Word)                                    2

**P**olyengineering, Inc.

53

12:00 p.m. Saturday. The Contractor and the City agree that the Contractor, at its discretion, may have the landfill open at other hours to facilitate disposal of non-hazardous and non-infectious solid waste.

5.    Holidays - Contractor may close the landfill on the following holidays: New Year's Day, Martin Luther King's Birthday, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. The holidays the landfill is open or closed will ultimately be determined at the discretion of the Contractor.

6.    Life of the Landfill - The City shall have disposal capacity privileges for waste generated by it and its citizens, residents, and inhabitants at the site of the landfill for the life of the Contractor's landfill, which shall be a minimum of twenty-five (25) years.

7.    Laws, Rules and Regulations - Contractor shall comply with all Federal, State and local laws, rules, regulations and permit conditions regulating solid waste transportation, management, storage and disposal.

8.    Operational Standards - To insure the environmental integrity of the sanitary landfill, the Contractor shall design, implement, or perform environmental safeguards at said landfill as follows:

8.1    Contractor shall apply at regular intervals daily, intermediate and final cover, or alternative cover permissible under applicable law, and shall keep the disposal area to the smallest practical size to reasonably control air quality, odors and eliminate rodents, insects and disease vectors.

8.2    Contractor shall install any and all composite liners, leachate collection systems, storm water control and filtration systems, ground water monitoring systems, landfill gas monitoring system and similar devices intended to prevent and/or monitor soil and groundwater contamination from the landfill as may be required by Subtitle D or other federal or state statutes and regulations, as amended.

8.3    Contractor shall take all reasonable steps to control litter. Steps shall include a requirement that all open bodied vehicles using the landfill be covered and shall include the daily pickup of all windblown litter.

8.4    Contractor shall implement an effective dust management and suppression program.

8.5    Contractor shall make reasonable efforts to minimize the amount of mud tracked onto the entrance road. Contractor shall be responsible for periodically cleaning entrance road of mud tracked from the Contractor's sanitary landfill. In the case the Contractor cannot prevent the tracking of mud, Contractor

#570434(Word)                         3

**Polyengineering, Inc.**

54

shall install and operate a wheel wash unit or equivalent technology in order to prevent the tracking of mud from the landfill property.

8.6    Contractor agrees to adhere to the design, construction and operational plans for the landfill, as approved by the Alabama Department of Environmental Management ("ADEM"). Contractor also agrees to permit an independent third party, selected and hired by the City, to annually audit the landfill to assess both the landfill's waste disposal operations and compliance with both this agreement and with the relevant environmental laws and regulations. The cost of this audit shall be borne by the Contractor, and the auditor shall invoice Contractor directly for payment for its services. Copies of the audit shall be furnished to both City and Contractor.

8.7    Subject only to the limits of the performance bond required by Section 26, unless some greater obligation is imposed by law, Contractor agrees to remove, remedy or otherwise respond in a manner protective of public health and the environment, any contaminants or hazardous substances which are released into the environment due to the operation of the landfill.

8.8    Contractor agrees to establish a 100-foot vegetative buffer around the perimeter of the landfill to be utilized as visual screening to the site.

8.9    Contractor agrees to landscape the entrance area into landfill.

8.10    Contractor agrees to minimize the number of acres cleared at any one time. Contractor shall reseed all cleared land immediately after use of said land for waste disposal is complete. Contractor will reforest all cleared land not used for waste disposal after its use is complete.

8.11    Contractor agrees to reasonably maintain all-weather interior roads to allow vehicle movement during inclement weather. The cost of such improvements shall be at the sole expense of the Contractor.

8.12    Contractor shall install an active methane gas extraction and collection system at the landfill site as required by regulations. Should odors from the landfill be discernable beyond the perimeter of the landfill, Contractor shall install a methane gas extraction and collection system capable of eliminating said odors. Once landfill gas volumes are sufficient to economically sustain a generating plant, and should one be developed, Contractor will offer to City the advantage of utilizing such power at a rate to be determined.

8.13    Contractor agrees to properly staff and train all landfill personnel in a manner consistent with the safe and secure operation of a solid waste landfill.

8.14    Contractor agrees to construct the landfill to have a sufficient designed capacity and to have sufficient equipment and personnel to comply with

#570434(Word)

4

**P**olyengineering, Inc.

55

Federal, State and local laws, rules, regulations, permit conditions, etc., regarding solid waste disposal.

8.15    Contractor agrees to provide the City with disposal capacity assurances for the life of the landfill, which shall be a minimum of twenty-five (25) years.  At periodic intervals not to exceed twelve months, the Contractor agrees to notify the City of annual compaction test results and advise the City of forecasted remaining landfill capacity and remaining landfill life (in years) for the landfill.

8.16    Contractor agrees to exercise reasonable efforts, to include regularly scheduled clean-up activities, to keep the entrance road as litter-free as reasonably possible.

8.17    In order to assure adequate post-closure care and monitoring of the landfill, Contractor agrees to fully comply with the requirements of 40 C.F.R. §§ 258.60 through 258.73 inclusive.  Within ninety days of the execution of this Agreement, Contractor shall provide the City with evidence, in the form of a letter from ADEM, stating that the Contractor possesses adequate financial assurance posted with the state to operate a landfill of the size and operation contemplated by this Agreement.  Contractor will also advise the City when closure plans are being prepared and will allow the City a timely opportunity to comment on those plans.

9.    Insurance - The Contractor shall carry the following types of insurance naming the City as an additional insured, in at least the limits specified below:

| | | |
|---|---|---|
| General Liability | - | $1,000,000 per each occurrence |
| Automotive Liability | - | $1,000,000 bodily injury and property |
| damage, | | |
| | | combined single limit per each occurrence |
| Property Damage | - | $1,000,000 per each occurrence |
| Umbrella Liability | - | $5,000,000 per occurrence |

9.1    All policies evidencing the insurance required by the terms of the preceding paragraph shall be taken out and maintained in generally recognized responsible insurance companies, qualified under the laws of the State of Alabama and may be written with co-insurance provisions and deductible amounts comparable to those applicable to similar policies carried by persons engaged in businesses of like size and type as the Contractor with respect to properties similar to the landfill.  The Contractor may self-insure for all or any part of the above coverage's with the prior written consent of the City, which consent shall not be unreasonably withheld, provided satisfactory evidence of the capacity to self-insure is provided to the City.  Any policies required by Section 9 of this agreement may be contained in blanket policies.

Polyengineering, Inc.

56

9.2     Provided, however, that in the event Contractor is unable to obtain insurance in the above stated limits at reasonable rates, and Contractor provides City with satisfactory evidence of Contractor's inability to acquire said insurance at reasonable rates, both parties agree to execute an amendment to this Agreement reflecting new limits for the above stated insurance. In such case the failure of Contractor to maintain insurance pursuant to Section 9 shall not constitute a default or breach under this Agreement.

9.3     Prior to the commencement date, the Contractor shall furnish to the City appropriate certificates of insurance certifying coverage's under each of the categories set forth in Section 9 above. Each certificate so furnished shall provide that the policy may not be canceled or materially changed without ten (10) days written notice to the City.

9.4     The Contractor will comply with the provisions of all applicable Workmen's Compensation laws. Contractor shall supply to City, upon request, certificates of insurance evidencing such coverage as described herein.

10.     Wasteshed, Volume Capacity and Usage - The Contractor is authorized to accept non-hazardous and non-infectious solid waste generated in a service area encompassing all states east of the Mississippi River, in addition to the entire state of Louisiana. The City and the Contractor agree that Contractor's landfill shall have a permitted volume capacity not to exceed 7500 tons per day, monthly average, pursuant to ADEM regulations. Contractor further agrees that no change, variance, waiver or modification to or from any provision of any permit issued by ADEM to Contractor regarding the operation of the landfill will be requested from ADEM without prior approval by the City.

11.     Sole Deposit Point - City agrees to the extent legally permissible during the term of this Agreement, or any extension thereof, to direct the disposal of all non-hazardous and non-infectious solid waste collected within the City by City's franchise haulers or by City in City-owned vehicles to Contractor's sanitary landfill.

12.     Landfill Rules and Regulations - The Contractor shall have the right to establish and, from time to time, modify, alter or rescind, reasonable standards and policies necessary, appropriate or desirable for the operation of the landfill, including standards concerning access, safety, operation and types of substances to be deposited in the landfill.

12.1     All standards and policies established by the Contractor shall be posted at the landfill and a copy thereof shall be sent by registered mail, return receipt requested to the City; provided, however, that non-receipt by the City of such shall not affect the validity or effectiveness of the same.

12.2     When entering the site or delivering solid waste to the landfill, the City and its officials, agents and employees will comply with all reasonable

#570434(Word)                                           6

**P**olyengineering, Inc.

57

standards and policies established by the Contractor or otherwise applicable to the landfill to the extent that such standards and policies do not interfere with the City's governmental responsibilities, including by way of example its police powers and public health responsibilities. Nothing in this Agreement shall be deemed to supply standards and policies adopted by the Contractor with the force of law or subject such standards to enforcement by the City.

13.    Compensation and Billing - The Contractor shall charge a base charge (the "Gate Fee") for disposal of typical household, commercial and industrial solid waste in the landfill. Except for (i) the Gate Fee charge exemptions afforded to the residences located within the corporate limits of Brundidge, as identified in Sections 13.1 and 13.4; (ii) the disposal opportunities provided to the residents of Pike County, as identified below in Section 13.2 and 13.4 and (iii) the Gate Fee for the residential disposal for the governmental entities (or their contract collectors), as identified in Section 13.3, the Gate Fee shall be set at prevailing commercial rates. The Contractor may charge an additional reasonable fee or charge (a "Surcharge") for additional recovery, treatment, handling, storage or disposal of Special Wastes. All Gate Fees represented in this Section shall include any administrative fees and compensation as specified in Sections 14, 15, 16 and 17.

13.1    The Gate Fee assessed for the disposal of any residential waste generated or collected in Pike County, outside the corporate municipal limits of Brundidge, will be no more than $20.00 per ton, inclusive of all administrative fees, for the life of the landfill. However, once a twelve-month period passes during which the landfill achieves an average disposal rate of 1500 tons per day (as based on the relevant reporting to ADEM) throughout the course of that twelve-month period, the Contractor shall commence to provide free collection and disposal to the residents of Brundidge. The number of residents of Brundidge benefiting from such free collection and disposal shall not exceed 2,000 during the twelve-month period the City qualifies for this benefit and shall in no case ever exceed 3,000 residents thereafter. Once free collection and disposal privileges commence, they may not be revoked, even if disposal rates fall back below the aforementioned 1500 ton-per-day threshold.

13.2    The Gate Fee for the governmental entities or their contract providers for the counties of Autauga, Barbour, Bullock, Butler, Coffee, Conecuh, Covington, Crenshaw, Dale, Dallas, Elmore, Escambia, Geneva, Henry, Houston, Lowndes, and Montgomery shall be no more than $22.00 per ton, inclusive of all administrative fees. This rate will be subject to the CPI increases as specified in Section 13.6. This rate will also be subject to any increase in cost to cover expenses associated with complying with any new or modified ADEM or Federal regulations.

13.3    Any individual who is a resident of Pike County shall be entitled to use Contractor's landfill a maximum two (2) times per year at no charge provided that:

#570434(Word)                                  7

<b>P</b>olyengineering, Inc.

58

13.3.1. Said individual provides Contractor with proof of residence in Pike County, and provides proof of participation in a legitimate solid waste collection program.

13.3.2. The waste to be disposed of is generated at the customer's residence.

13.3.3. The total volume to be disposed of per load is less than 3 cubic yards or 1,000 pounds.

13.3.4. All waste to be disposed of under this section shall be pursuant to Section 31 of this Agreement.

13.4    The Contractor shall provide, maintain and operate suitable truck scales at the site and shall establish a reasonable system for ascertaining the quantity of solid waste measured by weight. For each load of solid waste delivered to the landfill, the Contractor shall determine the weight and shall compute the applicable Gate Fee and surcharge, if applicable, and shall give a copy of the receipt to the driver or other person delivering such load and shall maintain a copy of such receipt.

13.5    Changes in the Gate Fee shall be calculated based on changes in the CPI. The Contractor may increase the Gate Fee annually on each October 1, beginning with October 1, 2002. The percentage of increase shall be based on, and shall be the same as the CPI. Regardless of the CPI, however, any such increases shall not exceed 4% annually. The base CPI shall be the CPI published for month of June 2001. On July 1 of the first year in which the landfill is operational and every twelve (12) month period thereafter, Contractor shall, notwithstanding the annual 4% cap, compute the percentage of increase in the Gate Fee for the upcoming year based solely on the CPI. Notices of increases must be submitted to applicable entities thirty days before the increase is effective. The CPI increases do not apply to the Gate Fee rates for City of Brundidge or Pike County as specified in Section 13.1, 13.2 and 13.4.

14.    Administrative Fee - Contractor agrees to collect and forward to the City a host administrative fee to compensate the City for expenses (including equitable expenses) associated with the presence of a sanitary landfill within the jurisdiction of the City. Contractor agrees to deliver to the City a fee on all solid waste that Contractor accepts for disposal at the Contractor's landfill, during the term of this Agreement. The fee shall be determined based on the total amount of waste accepted for disposal during the course of the relevant month. Contractor shall determine the appropriate fees due to the City, and shall forward, with appropriate documentation, payment of the appropriate amount by the twenty-fifth (25th) day after the last day of the relevant month. Contractor shall provide the City with access to all tonnage and volume data so that the City may

**P**olyengineering, Inc.

59

audit the Contractor's data to determine the accuracy of administrative fees delivered to the City. City shall not audit Contractor's tonnage more than one (1) time per calendar year. Contractor agrees to deliver to the City the administrative fee based on the following:

| | | |
|---|---|---|
| daily average is less than 400 tons per day | - | $0.75 per ton |
| daily average is between 401 – 700 tons per day | - | $1.15 per ton |
| daily average is between 701– 1000 tons per day | - | $1.85 per ton |
| daily average is between 1001 – 1500 tons per day | - | $2.25 per ton |
| daily average is between 1501 – 2500 tons per day | - | $3.00 per ton |
| daily average is greater than 2500 tons per day | - | $4.50 per ton |
| surcharge for special wastes | - | $1.75 per ton |

The administrative fee shall be computed to be the greater amount of the actual volumes received based on the rates above and the minimum monthly administrative fee. These minimum payments are due regardless of the actual tonnage disposed in the landfill in a given month. The minimum administrative monthly fee rates and schedules shall be as following:

14.1    The daily average is computed on a monthly average, pursuant to ADEM regulations. The administrative fee is calculated by first determining the applicable daily average for said month, and then multiplying the total tons of waste received for said month by the corresponding per ton fee. The surcharge on special waste is in addition to any administrative fees based on the tonnage. Additionally, the Contractor shall be responsible for the payment of a minimum monthly administrative fee to City. The minimum monthly administrative fee shall be calculated by multiplying the landfill's average revenue for the previous six-month period by 2.5%, or it shall be $4500, whichever is greater. Regardless of revenue figures or disposal operations, the minimum monthly administrative fee owed shall never be less than $4500 per month. The first payment of such minimum fees, covering the month of May 2002, shall be due to the City on June 25, 2002.

14.2    Changes in the administrative fee rates stated above shall be calculated based on changes in the CPI. The Contractor shall increase the administrative fee to the City annually on each October 1, beginning with October 1, 2002. The percentage of increase shall be based on, and shall be the same as, the CPI. Regardless of the CPI, however, any such increases shall not exceed 4% annually. The base CPI shall be the CPI published for June 2001. On July 1 of the first year in which the landfill is operational and every twelve (12) month period thereafter, Contractor shall, notwithstanding the annual 4% cap, compute the percentage of increase in the administrative fee for the upcoming year based solely on the CPI.

14.3    In the event the Contractor is awarded a contract to receive a large volume of waste generated outside the State of Alabama for disposal at the

#570434(Word)    9

**Polyengineering, Inc.**

Case 2:06-cv-01066-MEF-WC    Document 1-6    Filed 11/29/2006    Page 10 of 17

60

landfill, the Contractor shall pay the City a one-time royalty payment of $100,000. This royalty payment shall be due, at the discretion of the Contractor, either (i) in one up-front lump sum due the month the Contractor begins to dispose of the waste received pursuant to the large waste volume contract; or (ii) in regular monthly payments of the course of twelve months, commencing with the first month the Contractor begins to dispose of the waste received pursuant to the large waste volume contract. This royalty payment will only be paid once, and subsequent awards of large volume waste disposal contracts will not require further payments. For the purposes of this paragraph, "a contract to receive a large volume of waste generated outside the State of Alabama for disposal at the landfill" shall mean a contract that enables Contractor to increase the volume of waste it disposes at the landfill by 2,000 or more tons per day for any given period. In order to ensure compliance with this section, Contractor shall provide the City with a quarterly report detailing its current and forecasted out-of-state waste streams. This reporting requirement shall cease once the royalty payment is made.

15.    Support for Local Industrial Development - Contractor shall, on a monthly basis, pay to the city and the city shall deposit $0.10 per ton of waste disposed at the landfill into a federally insured account which shall be held in the name of the City. At its discretion, the City may use funds in the above account for the sole purpose of recruiting, encouraging, or facilitating economic and industrial development in Brundidge and Pike County. The City shall not use funds in the account for any other purpose. Contractor may audit the City's withdrawals from the account no more than one (1) time per calendar year.

16.    Entrance Road Maintenance and Repair - Contractor shall, on a monthly basis, pay to the city and the city shall deposit $0.10 per ton of waste disposed at the landfill into a federally insured account, which shall be held in the name of the City for the sole purpose of repairing and maintaining the entrance road. The City shall not use funds in the account for any other purpose. Contractor may audit the City's withdrawals from the account no more than one (1) time per calendar year

17.    Notices - Notices of conditions or situations affecting the work to be performed under this Agreement shall be given in writing between designated operating personnel of the Contractor and the City. All notices shall be given in writing, to be delivered by certified mail, to the parties as set forth below:

If to the Contractor, at:
General Manager
Brundidge Landfill, LLC
P.O. Box 416
Brundidge, AL. 36010

#570434(Word)

10

**P**olyengineering, Inc.

61

If to the City, at :

Mayor
City of Brundidge
Post Office Box 638
Brundidge, Alabama 36010

18.    Waste Ownership - City agrees that all solid waste disposed of at the Contractor's sanitary landfill shall be the property of the Contractor. City shall make no claim of ownership to the solid waste deposited at the Contractor's sanitary landfill.

19.    Taxes, Licenses and Fees – With the exception of the considerations given in Section 13, 14, 15, and 16, the City agrees not to assess or levy any taxes, licenses, fees or assessments on the Contractor's landfill that is not also a tax, license, fee or assessment that is assessed to other businesses in City of Brundidge. This provision shall also apply to the Contractor and any of its affiliates.

20.    Severance Tax - With the exception of the considerations given in Section 13, 14, 15, and 16, the City agrees not to assess or levy any taxes, fees, riders, or other assessments, to the Contractor to recover fees for severance use of the Contractor's sanitary landfill capacity. City also agrees not to assess any surcharges to the revenues of the Contractor's sanitary landfill.    Notwithstanding the solid waste authority contemplated in Section 37, the City also agrees not to place any governmental revenue collection function or authority on the Contractor.

21.    Regulatory Approvals – Except as follows, the City agrees to support and exercise, as host government, any and all actions which is protective of public health and necessary to secure all necessary and appropriate regulatory permits for the development of the landfill. Following the public notice and public hearing required by Ala. Code 22-27-48(a), however, City reserves the right, as matter of public policy, to deny local approval if community input and comment on the proposed permit modification indicates that such modification is not in the best interest of the community.  In such a case, the denial of local approval shall not be deemed an actionable breach of this Agreement but shall serve to cancel all parties' obligations, duties, and responsibilities pursuant to this Agreement.  Accordingly, in such a case, Contractor agrees to make no legal claims against City with regard to such rejection of local approval.

22.    Landfill Use – Notwithstanding Section 21, City agrees not to legislate any ordinance, law, statute or regulation, or to ask, solicit, encourage, any governmental entity to pass any legislation that restricts the usage of the Contractor's sanitary landfill for its intended use as a sanitary landfill for the disposal of non-hazardous and non-infectious solid waste from the above stated wasteshed.

23.    Local Legislation - The City agrees not to enact or adopt any statute, ordinance, resolution, rule or regulation governing the operation of the landfill which is

#570434(Word)                               11

**P**olyengineering, Inc.

62

more stringent than those imposed by ADEM or the Environmental Protection Agency (EPA) or which prevents the Contractor from depositing non-hazardous and non-infectious solid waste from the above stated wasteshed in the landfill.

24.    Support for Annexation – Should Contractor expand the landfill onto land beyond the current municipal limits of the City, Contractor agrees to support efforts by the City to annex such land within the City's limits.

25.    Indemnification – Contractor does hereby indemnify and hold the City harmless from all liens, claims, judgments, liabilities, causes of action, assessments, fines, or attorney's fees incurred or caused by acts or omissions of Contractor at Contractor's landfill for the life of the landfill to include the post closure period, including but not limited to, any fines, assessments, or penalties made or levied by the Environmental Protection Agency, the Alabama Department of Environmental Management, or any other regulatory agency in connection with the operation of said landfill. The City shall have the right to select an attorney or attorneys to defend it against any such liens, claims, judgments, liabilities, causes of action, assessments, firms, or attorney's fees.

25.1    Contractor hereby agrees to indemnify, hold harmless and defend the City from and against any claims, actions, suits, damages, liabilities, costs and/or expenses (including attorney's fees) resulting from personal injury (including death) to any party, or damage to the property thereof, in any manner caused by, arising from or incidental to the services to be performed under this Agreement, except any claims which are caused by the negligence of the City. The City shall have the right to select an attorney or attorneys to represent it with respect to any such claim.

25.2    Contractor shall indemnify and hold harmless the City against and in respect of any loss, damage, liability, cost and expense, including reasonable attorneys' fees and amounts paid in settlement or otherwise suffered or incurred by the City by reason of or arising out of Contractor's (i) failure to comply with applicable federal, state or local laws or regulations concerning the environment, as now existing or as hereafter adopted, or (ii) failure to comply with its responsibilities and duties under this Agreement. The City shall have the right to select an attorney or attorneys to represent it with respect to any such claim.

25.3    City hereby agrees to indemnify, hold harmless and defend the Contractor from and against any claims, actions, suits, damages, liabilities, costs and/or expenses (including attorney's fees) resulting from personal injury or death to any party, or damage to the property thereof arising from any act or omission of the City in the transportation of solid waste to or from the Contractor's sanitary landfill, except any claims which are caused by the negligence of the Contractor.

26.    Performance Bond – Once the Contractor reaches waste volumes of 1500 tons per day, the Contractor shall increase the amount of its existing $500,000

#570434(Word)                12

**P**olyengineering, Inc.

63

performance bond to an amount of $1,500,000 guaranteeing the continued faithful performance of this contract. The bond shall be from a surety acceptable to the City.

27.    <u>Resource Recovery</u> - City agrees that Contractor may investigate the feasibility of utilizing solid waste or its byproducts for the purpose of recovering any resource from the waste that the Contractor desires.

28.    <u>Local Plan</u> - The City represents and warrants that it has adopted a local Solid Waste Management Plan and that this Agreement is consistent with such Solid Waste Plan. The City has taken all action necessary or appropriate in order for the City to carry out the obligations and actions described herein, with the exception of the local approval requirements referenced in Section 21 of this Agreement.

29.    <u>Severability</u> - In case any one or more of the provisions of this Agreement shall be held to be invalid, illegal, unconstitutional, void or unenforceable, the remainder of this contract shall remain in full effect until the expiration date.

30.    <u>Amendments and Assignments</u> - This Agreement may be amended only by any instrument in writing signed by both parties to this Agreement. Both parties agree that neither party may assign any portion of this Agreement or in its entirety, without the prior written concurrence of both parties.

31.    <u>Right of Inspection</u> - The City agrees and grants that the Contractor has the authority to inspect any vehicle, load or volume of waste brought to the Contractor's sanitary landfill for violations of Federal, State, or local laws, statutes, ordinances, rules, regulations or permit conditions and acknowledges that Contractor can reject any container or volume of waste that Contractor reasonably believes fails to comply with such laws, statutes, ordinances, rules, regulations, permit conditions or Contractor's operating procedures. It shall be the responsibility of the transporter to manage the rejected load in a prudent and legal manner.

32.    <u>Hazardous and Infectious Waste</u> - Both parties hereto agree that the landfill is not licensed, permitted or intended for the disposition of hazardous or infectious wastes. The Contractor agrees that it will not accept any hazardous or infectious wastes, containers, liquids or any substances prohibited from disposition in sanitary landfills by Federal or State law, rule or regulation.

33.    <u>Wastewater Acceptance</u> - City understands that the Contractor requires an outlet for wastewater treatment of the leachate from the Contractor's landfill. City agrees to accept leachate from the Contractor for treatment at the City's wastewater treatment facility ("WWTF") subject to the requirements and limitations set forth below:

33.1.    Acceptance of Contractor's said leachate shall be contingent upon approval and permitting of said acceptance by the Alabama Department of Environmental Management through issuance of a State Indirect Discharge (SID)

#570434(Word)                        13

<span style="font-variant: small-caps;">**P**olyengineering, Inc.</span>

64

Permit to Contractor. All costs associated with obtaining and maintaining said SID Permit shall be the responsibility of the Contractor.

33.2  Contractor understands that City's acceptance of said leachate is contingent upon the following general discharge limitations that apply to all significant industrial users of the Brundidge sewer system:

33.2.1 The leachate discharge shall not overload, upset, or otherwise inhibit the operation of the City WWTF.

33.2.2 The leachate discharge shall not result in a "pass-through" of one or more pollutants through the WWTF that would cause the WWTF to violate its NPDES Permit whether by increased toxicity or other factors.

33.2.3 The leachate discharge shall not contaminate sludge from the WWTF to such an extent as to cause the sludge to be placed in a less desirable classification under EPA's 503 Regulations than would otherwise be the case absent discharge.

33.3  Contractor shall be responsible for installing flow-measuring equipment to enable City to accurately ascertain the volume of leachate discharged to the WWTF, and the City shall have the right to audit such equipment.

33.4  Contractor shall comply with all terms and conditions of SID; Contractor shall perform monitoring in accordance with the SID Permit used by ADEM and shall furnish copies of all monitoring reports to the City.

33.5  The Contractor shall pay the City for wastewater treatment services at rates determined by the City to be consistent with the City's ADEM and EPA approved sewer user charge system as is periodically updated by the City. However, in no case shall the charge for wastewater treatment services be less than $.03 per gallon.

This provision shall survive the termination of this Agreement and any renewal of this Agreement for a period of one (1) year after the effective date of termination.

34. Contractor's Status - Contractor is an independent contractor and not an agent or representative of the City and nothing herein shall be construed as creating any principal- agent or master-servant relationship between the City and Contractor.

35. ADEM Permit - Contractor agrees to use its due diligence and best efforts to expeditiously obtain and maintain in good standing all necessary environmental permits. Should Contractor, after having exercised its due diligence and best efforts to obtain any necessary approvals from ADEM to open and operate the landfill, be unable to obtain all

**P**olyengineering, Inc.

65

such approvals, Contractor may, at its sole option, terminate this Agreement. Should such termination occur, however, no payments previously made to the City pursuant to this Agreement shall be considered refundable to Contractor and Contractor hereby agrees not to seek repayment of same. The City agrees that it will exert its best efforts in assisting the Contractor in obtaining such permits and/or approvals from ADEM, notwithstanding the provisions of Sections 10 and 21.

36. <u>Sale or Transfer of Landfill to Third Party</u> – Contractor shall not sell the landfill to a third party, or undergo a corporate reorganization that vests control of the landfill in some entity other than Brundidge Landfill, LLC, without the express prior approval of the City. In such instances, Contractor shall provide the City with the option and right of first refusal to purchase the landfill from Contractor. Furthermore, it is the desire of the City that the terms and conditions of this Contract shall be binding on any subsequent owners of the landfill. Accordingly, should the ownership of the landfill be transferred, Contractor agrees to specifically and expressly transfer the obligations, responsibilities, terms and conditions under which it operates pursuant to this Contract to the purchaser or new owner of the landfill.

37. <u>Assignment of Contract to Solid Waste Authority</u> - Notwithstanding the provisions of paragraph 30, "Amendments and Assignments," in the event that the City of Brundidge elects to form a solid waste disposal authority pursuant to <u>Ala. Code</u> section 11-89A-1 <u>et seq.</u> or similar relevant statute, Contractor agrees that the City may assign this Agreement, and its rights and obligations thereunder, to such authority and also agrees to amend the Agreement at such time to change the term of the Agreement to a period of twenty-five years or the life of the landfill, whichever may be greater. Contractor shall not oppose such a transfer and shall continue to be obligated under this Agreement to such authority.

38. <u>Breach</u> - In the event either party fails to materially perform in accordance with the terms of this Agreement, the injured party shall give notice of said breach to the breaching party in writing by certified mail outlining the deficiency in question. The breaching party shall have a period of thirty (30) days from the receipt of said notice to correct said deficiency and regain compliance under the contract. In the event no correction is made within said thirty (30) day period, and in the event no arbitration has been commenced, then the injured party, at its sole option, may terminate this Agreement because of breaching party's breach thereof and said injured party shall have all remedies enumerated herein and available under the laws of the State of Alabama.

39. <u>Force Majeure</u> - The obligations of City and Contractor are subject to strikes, riots, wars, fires, acts of God, accidents, governmental orders and regulations and other similar or different contingencies beyond the reasonable control of City or the Contractor, as the case may be. This Force Majeure provision, however, explicitly does not excuse Contractor's obligation to make the Initial Royalty payment specified in Section 14.1 in the event of Contractor's failure to obtain the necessary solid waste management permit from ADEM.

#570434(Word)                                  15

**P**olyengineering, Inc.

66

40. Representations

    40.1    The City makes the following representations and warranties as the basis for its undertakings pursuant to this Agreement, notwithstanding the provisions and limitations of Section 21:

        40.1.1  The City has the power and authority to enter into the transactions contemplated by this Agreement and to fulfill and carry out its obligations hereunder; and

        40.1.2  The execution and delivery of this Agreement on its part have been duly authorized by a resolution duly adopted by its City Council and by all other necessary actions.

        40.1.3  This Agreement constitutes the legally binding obligations of the City. Notwithstanding the foregoing, in the event any court in the State of Alabama shall declare this Agreement void, for any reason, the City shall not be responsible to Contractor for any fees or expenses which have not already been paid to Contractor at the time such judgment is entered.

    40.2    The Contractor makes the following representations and warranties as the basis for its undertakings pursuant to this agreement:

        40.2.1  The Contractor is a limited liability corporation under the laws of Delaware and has the power to enter into and to perform and observe the agreement and covenants on its part contained in this agreement; and,

        40.2.2  The Contractor has the power to fulfill and carry out the provisions of this agreement; and

        40.2.3  The execution and delivery of this Agreement on the part of the Contractor have been duly authorized by all necessary corporate action.

    41.   Jurisdiction - This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama except as otherwise necessary to comply with the regulations and orders of the United States Environmental Protection Agency, in which event the laws of the United States shall govern the interpretation and construction of this Agreement.

    42.   Entire Agreement and Effective Date - This Agreement contains the entire agreement of the parties and supersedes all prior negotiations, agreements and oral understandings between the parties hereto. This Agreement shall become effective, for the purposes of the application process for the necessary permits and approvals from state

#570434(Word)

16

**P**olyengineering, Inc.

67

regulatory bodies, immediately upon its execution in full by City and the Contractor and shall be binding upon and shall inure to the benefit of City and the Contractor, and the Contractor's successors and assigns.

WITNESS OUR HANDS AND SEALS on the day and date first entered above.

ATTESTED:                                CITY OF BRUNDIDGE, ALABAMA

By: _____              By: _____
Its City Clerk                                 Its Mayor


ATTESTED:                                BRUNDIDGE LANDFILL, LLC

By: _____              By: _____
Its Secretary                               Its: Executive Vice President

Polyengineering, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| CITY OF BRUNDIDGE, ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | [Case No. CV-06-0275-JWK in |
| BRUNDIDGE LANDFILL, LLC, | ) | the Circuit Court of Pike County, |
| ALLIED WASTE INDUSTRIES, INC., | ) | Alabama] |
| ALLIED WASTE NORTH AMERICA, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | | |

### DEFENDANT ALLIED WASTE NORTH AMERICA, INC.'S
### <u>CONSENT TO REMOVAL</u>

Defendant Allied Waste North America, Inc. hereby serves notice that it consents to the removal of this action to the United States District Court for the Middle District of Alabama.

Respectfully submitted, this <u>29th</u> day of November, 2006.



_____
One of the Attorneys for Defendant
Allied Waste North America, Inc.

EXHIBIT
2

OF COUNSEL:
J. Banks Sewell, III (SEW003)
J. Chandler Bailey (BAI043)
C. Meade Hartfield (HAR281)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (fax)

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 29th day of November, 2006, a true and correct copy of the foregoing was served on counsel of record by depositing a copy of same in the United States Mail, postage prepaid, properly addressed to:

Andrew P. Campbell
Caroline Smith Gidiere
CAMPBELL, WALLER & POER, LLC
2100-A SouthBridge Parkway, Suite 450
Birmingham, LA 35209
205.803.0051
Fax: 205.803.0053

Richard F. Calhoun
CALHOUN, FAULK, CURTIS & FAIRCLOTH, LLC
78 S. Court Square
P.O. Box 489
Troy, AL 36081
334.566.7200


Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CITY OF BRUNDIDGE, ALABAMA,  )
                                     )
       Plaintiff,              )
                                     )     CIVIL ACTION NO.
v.                           )
                                   )     [Case No. CV-06-0275-JWK in
BRUNDIDGE LANDFILL, LLC,      )     the Circuit Court of Pike County,
ALLIED WASTE INDUSTRIES, INC., )     Alabama]
ALLIED WASTE NORTH AMERICA, )
INC.,                              )
                                   )
       Defendants.

## DEFENDANT ALLIED WASTE INDUSTRIES, INC.'S
## CONSENT TO REMOVAL

Defendant Allied Waste Industries, Inc. hereby serves notice that it consents
to the removal of this action to the United States District Court for the Middle
District of Alabama.

Respectfully submitted, this 29th day of November, 2006.

One of the Attorneys for Defendant
Allied Waste Industries, Inc.

**EXHIBIT**
F

OF COUNSEL:
J. Banks Sewell, III (SEW003)
J. Chandler Bailey (BAI043)
C. Meade Hartfield (HAR281)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on this _29th_ day of _November_, 2006, a true and correct copy of the foregoing was served on counsel of record by depositing a copy of same in the United States Mail, postage prepaid, properly addressed to:

Andrew P. Campbell
Caroline Smith Gidiere
CAMPBELL, WALLER & POER, LLC
2100-A SouthBridge Parkway, Suite 450
Birmingham, LA 35209
205.803.0051
Fax: 205.803.0053

Richard F. Calhoun
CALHOUN, FAULK, CURTIS & FAIRCLOTH, LLC
78 S. Court Square
P.O. Box 489
Troy, AL 36081
334.566.7200

_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CITY OF BRUNDIDGE, ALABAMA,  )
  )
    Plaintiff,  )
  )    CIVIL ACTION NO.
v.  )
  )    [Case No. CV-06-0275-JWK in
BRUNDIDGE LANDFILL, LLC,  )    the Circuit Court of Pike County,
ALLIED WASTE INDUSTRIES, INC.,  )    Alabama]
ALLIED WASTE NORTH AMERICA,  )
INC.,  )
  )
    Defendants.

## DEFENDANT BRUNDIDGE LANDFILL, LLC'S
## CONSENT TO REMOVAL

Defendant Brundidge Landfill, LLC hereby serves notice that it consents to

the removal of this action to the United States District Court for the Middle District

of Alabama.

Respectfully submitted, this 29th day of November, 2006.

_____

One of the Attorneys for Defendant
Brundidge Landfill, LLC

**EXHIBIT**

tabbies

4

OF COUNSEL:
J. Banks Sewell, III (SEW003)
J. Chandler Bailey (BAI043)
C. Meade Hartfield (HAR281)
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203-3200
(205) 581-0700
(205) 581-0799 (fax)

## CERTIFICATE OF SERVICE

This is to certify that on this _29th_ day of _November_, 2006, a true and correct copy of the foregoing was served on counsel of record by depositing a copy of same in the United States Mail, postage prepaid, properly addressed to:

      Andrew P. Campbell
      Caroline Smith Gidiere
      CAMPBELL, WALLER & POER, LLC
      2100-A SouthBridge Parkway, Suite 450
      Birmingham, LA 35209
      205.803.0051
      Fax: 205.803.0053

      Richard F. Calhoun
      CALHOUN, FAULK, CURTIS & FAIRCLOTH, LLC
      78 S. Court Square
      P.O. Box 489
      Troy, AL 36081
      334.566.7200

Of Counsel